# UNITED STATES *v.* JOINT TRAFFIC ASSOCIATION.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 84. Argued February 24, 25, 1898. — Decided October 24, 1898.

Thirty-one railroad companies, engaged in transportation between Chicago and the Atlantic coast, formed themselves into an association known as the Joint Traffic Association, by which they agreed that the association should have jurisdiction over competitive traffic, except as noted, passing through the western termini of the trunk lines and such other points as might be thereafter designated, and to fix the rates, fares and charges therefor, and from time to time change the same. No party to the agreement was to be permitted to deviate from or change those rates, fares or charges, and its action in that respect was not to affect rates disapproved, except to the extent of its interest therein over its own road. It was further agreed that the powers so conferred upon the managers should be so construed and exercised as not to permit violation of the Interstate Commerce Act, and that the managers should coöperate with the Interstate Commerce Commission to secure stability and uniformity in rates, fares, charges, etc. The managers were given power to decide and enforce the course which should be pursued with connecting companies, not parties to the agreement, which declined or failed to observe the established rates. Assessments were authorized in order to pay expenses, and the agreement was to take effect January 1, 1896, and to continue in existence for five years. The bill, filed on behalf of the United States, sought a judgment declaring that agreement void. *Held,*

(1) That upon comparing this agreement with the one set forth in *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, the similarity between them suggests that a similar result should be reached in the two cases, as the point now taken was urged in that case, and was then intentionally and necessarily decided ;

(2) That so far as the establishment of rates and fares is concerned there is no substantial difference between this agreement and the one set forth in the *Trans-Missouri case ;*

(3) That Congress, with regard to interstate commerce, and in the course of regulating it in the case of railroad corporations, has the power to say that no contract or combination shall be legal, which shall restrain trade and commerce, by shutting out the operation of the general law of competition.

THE bill was filed in this case in the Circuit Court of the United States for the Southern District of New York for the purpose of obtaining an adjudication that an agreement

entered into between some thirty-one different railroad companies was illegal, and enjoining its further execution.

These railroad companies formed most (but not all) of the lines engaged in the business of railroad transportation between Chicago and the Atlantic coast, and the object of the agreement, as expressed in its preamble, was to form an association of railroad companies " to aid in fulfilling the purpose of the Interstate Commerce act, to coöperate with each other and adjacent transportation associations to establish and maintain reasonable and just rates, fares, rules and regulations on state and interstate traffic, to prevent unjust discrimination and to secure the reduction and concentration of agencies and the introduction of economies in the conduct of the freight and passenger service." To accomplish these purposes the railroad companies adopted articles of association, by which they agreed that the affairs of the association should be administered by several different boards, and that it should have jurisdiction over all competitive traffic (with certain exceptions therein noted) which passed through the western termini of the trunk lines (naming them), and such other points as might be thereafter designated by the managers. The duly published schedules of rates, fares and charges, and the rules applicable thereto, which were in force at the time of the execution of the agreement and authorized by the different companies and filed with the Interstate Commerce Commission, were reaffirmed by the companies composing the association. From time to time the managers were to recommend such changes in the rates, fares, charges and rules as might be reasonable and just and necessary for governing the traffic covered by the agreement and for protecting the interests of the parties to the agreement, and a failure to observe such recommendations by any of the parties to the agreement was to be deemed a violation of the agreement. No company which was a party to it was permitted in any way to deviate from or to change the rates, fares, charges or rule set forth in the agreement or recommended by the managers, except by a resolution of the board of directors of the company, and its action was not to affect the rates, etc., disapproved, except to the ex-

tent of its interest therein over its own road. A copy of such resolution of the board of any company authorizing a change of rates or fares, etc., was to be immediately forwarded by the company making the same to the managers of the association, and the change was not to become effective until thirty days after the receipt of such resolution by the managers. Upon the receipt of such resolution the managers were " to act promptly upon the same for the protection of the parties hereto." It was further stated in the ·agreement that " the powers conferred upon the managers shall be so construed and. exercised as not to permit violation of the Interstate Commerce act, or any other law applicable to the premises or any provision of the charters or the laws applicable to any of the companies parties hereto, and ·the managers shall coöperate with the Interstate Commerce Commission to secure stability and uniformity in the rates, fares, charges and rules established hereunder."

One provision of the agreement was to the effect that the managers were charged with the duty of securing to each company which was a party to the agreement equitable proportions of the competitive traffic covered by· the agreement, so far as it could be legally done. The managers were given power to decide and enforce the course which should be pursued with connecting companies, not parties to the agreement, which might decline or fail to observe the rates, etc., established under it, and the interests of parties injuriously affected by such action of the managers were to be accorded reasonable protection in so far as the managers could reasonably do so. When in the judgment of the managers it was necessary to the purposes of the agreement, they might determine the divisions of rates and fares between connecting companies who were parties to the agreement and connections not parties thereto, keeping in view uniformity and the equities involved.

Joint freight and passenger agencies might be organized by the managers, and, if established, were to be so arranged as to give proper representation to each company party to the agreement. Soliciting or contracting passenger ·or freight agencies were not to be maintained by the companies, ·except

with the approval of the managers, and no one that the managers decided to be objectionable was to be employed or continued in an agency. The officials and employés of any of the companies could be examined, and an investigation made when, in the judgment of the managers, their information or any complaint might so warrant. Any violation of the agreement was to be followed by a forfeiture of the offending company in a sum to be determined by the managers, which should not exceed five thousand dollars, or if the gross receipts of the transaction which violated the agreement should exceed five thousand dollars, the offending party should, in the discretion of the managers, forfeit a sum not exceeding such gross receipts. The sums thus collected were to go to the payment of the expenses of the association, except that the offending company should not participate in the application of its own forfeiture.

The agreement also provided for assessments upon the companies in order to pay the expenses of the association, and also for the appointment of commissioners and abitrators who were to decide matters coming before them. No one retiring from the agreement before the time fixed for its final completion, except by the unanimous consent of the parties, should be entitled to any refund from the residue of the deposits remaining at the close of the agreement.

It was to take effect January 1, 1896, and to continue in existence five years, after which any company could retire upon giving ninety days' written notice of its desire to do so.

The bill filed by the Government contained allegations showing that all the defendant railroad companies were common carriers duly incorporated by the several States through which they passed, and that they were engaged as such carriers in the transportation of freight and passengers, separately or in connection with each other, in trade and commerce continuously carried on among the several States of the Union and between the several States and the Territories thereof. The bill also charged that the defendants, unlawfully intending to restrain commerce among the several States and to prevent competition among the railroads named, in respect to all their

interstate commerce, entered into the agreement referred to above, and it charged that the agreement was an unlawful one, and a combination and conspiracy, and that it was entered into in order to terminate all competition among the parties to it for freight and passenger traffic, and that the agreement unlawfully restrained trade and commerce among the several States and Territories of the United States, and unlawfully attempted to monopolize a part of such interstate trade and commerce. The bill ended with the allegation that the companies were preparing to put into full operation all the provisions of the agreement, and the relief sought was a judgment declaring the agreement void and enjoining the parties from operating their roads under the same. The defendant, the Joint Traffic Association, filed an answer (the other defendants substantially adopting it), which admitted the making of the contract, but denied its invalidity or that it is or was intended to be an unlawful contract, combination or conspiracy to restrain trade or commerce, or that it was an attempt to monopolize the same, or that it was intended to restrain or prevent legitimate competition among the railroads which were parties to the agreement. The answer, in brief, denied all allegations of unlawful acts or of an unlawful intent, unless the making of the agreement itself was an unlawful act. The answer then set forth in quite lengthy terms a general history of the condition of the railroad traffic among the various railroads which were parties to the agreement at the time it was entered into, and alleged the necessity of some such agreement in order to the harmonious operation of the different roads, and that it was necessary as well to the public as to the railroads themselves.

The case came on for hearing on bill and answer, and the Circuit Court, after a hearing, dismissed the bill, and upon appeal its decree was affirmed by the Circuit Court of Appeals for the Second Circuit, and the Government has appealed here.

*Mr. Solicitor General* for appellants.

The agreement violates the anti-trust law, because it creates an association of competing trunk line systems, to which is

given jurisdiction over competitive interstate traffic, with power, through a central authority, aided by a skilful scheme of restrictions, regulations and penalties, to establish and maintain rates and fares on such traffic and prevent competition, thus constituting a contract in restraint of trade or commerce among the several States, as defined by this court in the *Trans-Missouri case*, 166 U. S. 290.

That case was elaborately argued and carefully considered. A petition for a rehearing was presented and denied. The decision has been accepted and acted upon by the Departments of the Government, and by the courts, both state and Federal, as definitively settling the meaning and scope of the anti-trust law when applied to traffic associations among competing interstate railway systems. The decision was not only a just, but an eminently salutary one. I shall not concede that the principles it laid down remain questionable. I shall not admit that it is necessary for me, by argument, to fortify the position taken by this court in that case. The anti-trust law, as there construed, is the law of the land.

The wisdom of Congress in prohibiting *all* agreements in restraint of trade among interstate railway systems is even more manifest now than when the *Trans-Missouri case* was decided. At the time of the argument of the *Trans-Missouri case*, it was still to some extent a mooted question whether the Interstate Commerce Commission was empowered to determine what are fair and reasonable rates, and to enforce such rates. This question is no longer open. *Interstate Commerce Commission* v. *N. O. & Tex. Pac. Railway*, 167 U. S. 479; *Interstate Commerce Commission* v. *Alabama Midland Railway*, 168 U. S. 144.

If it be urged that any illegality in the agreement is cured by section 3 of article 7, providing that "the powers conferred upon the managers shall be so construed and exercised as not to permit violation of the Interstate Commerce act, or any other law applicable to the premises, or any provision of the charters or the laws applicable to any of the companies parties hereto; and the managers shall cooperate with the Interstate Commerce Commission to secure stability and uni-

formity in the rates, fares, charges and rules established hereunder."

An injunction to construe and exercise powers conferred so as to permit no violation of law, is an admission that the powers may be so construed and exercised as to violate law. If the anti-trust law prohibited only those contracts in unreasonable restraint of trade or commerce there might be saving force in this section. But the anti-trust law prohibits *all* contracts in restraint of trade or commerce. Whether the rates be reasonable or unreasonable, an agreement providing for their establishment and maintenance by an association of interstate railways, is prohibited. The managers can exercise none of the essential powers conferred by the agreement without violating the law. In the matter of the essential powers, it is not a question of method or degree; the powers cannot be exercised, because they are in themselves illegal. The association itself is illegal. It is formed for the purpose of controlling certain competitive traffic. The central authority — the managers — is given the power to establish and maintain rates on that traffic. Take away from the association the power to establish and maintain rates, and it immediately falls to pieces. It ceases to have a *raison d'être.*

The authority of the Government to maintain this suit is sustained in *United States* v. *Freight Association,* 166 U. S. 290, 343, citing *in re Debs,* 158 U. S. 564; *Cincinnati, New Orleans, &c. Railway* v. *Interstate Commerce Commission,* 162 U. S. 184; *Texas & Pacific Railway* v. *Interstate Commerce Commission,* 162 U. S. 197.

*Mr. James C. Carter* (with whom was *Mr. Lewis Cass Ledyard* on the brief), for The Joint Traffic Association, appellee.

There are certain observations in relation to the Anti-Trust act which are properly to be made before proceeding to the argument.

There is no doubt that prior to and at the time of the pas-

sage of this law there were, as there still are, certain tendencies in the industrial world which drew widespread attention and excited, in some minds, much alarm. Many industries were seen, or supposed, to be under the control of great aggregations of capital, either in the hands of individuals united under some form of agreement, partnership or other, or contributed as the capital of corporate bodies. Some of the most conspicuous were called by the vague name of "trusts," and this term came to be employed, in a general way, to designate all of them. For obvious reasons, and quite aside from the question whether their objects and effects are mischievous or beneficial, such combinations of capital are not popular, and the designation " trust " came to be a rather reproachful one.

Undoubtedly it may be possible for a large aggregated capital to wield a greater power in many ways than would be possible for the same amount distributed among many separate owners or managers, and the suspicion was entertained that such power was employed in controlling markets, and perhaps in controlling legislation, and it was also thought to be an instrumentality by which the unequal distribution of wealth was fostered and increased. The disfavor thus excited was, as was natural, turned to political account. Those opposed to a protective tariff charged upon its advocates that they were favoring and stimulating trusts, and the latter felt the need of repelling the charge by doing something to show that they were the declared enemies of trusts.

Under such circumstances it was quite natural that schemes of legislation aimed against these supposed public enemies should be started, and any opposition to them would naturally draw upon the authors of it the reproach that they were the friends and, perhaps, the paid defenders, of these powerful interests.

While, therefore, all, or nearly all, professed themselves in favor of repressive legislation, the question what legislation could be contrived was a difficult one and suggested some difficult questions. How was a " trust " to be legally defined so that a prohibition of it should not include a prohibition of

the exercise of the clearest constitutional rights? Congress, surely, could not prevent the creation of corporations under state laws, or limit the capacity of forming partnerships, or in any manner interfere with the internal business of States. And was it certain that these so called trusts were, in every instance, necessarily mischievous? Indeed, sensible legislators for the most part understood very clearly that the things complained of were but the necessary incidents and consequences of the progress of industry and civilization and could not be arrested without checking the advance of the nation and crippling it in the fierce competitions with other nations, and that any useful effort to remedy the supposed evils must be directed against the abuses of the power of aggregated capital and not at the aggregations themselves. Under these circumstances Congress proceeded very cautiously and enacted the only measure which seemed possible without passing the plainest constitutional limits. It did not attempt to define "trusts," or limit aggregations of capital in any form. The general charge was that these combinations were in some form monopolies, and in restraint of trade, but Congress did not in the remotest degree attempt to define what a monopoly or restraint of trade was. It was, however, perfectly safe to declare that if these combinations did in any case create monopolies, or restraints upon trade, they should be prohibited from so doing in the future; and this is what Congress did and all it did, by passing the act in question. It prohibited contracts and combinations to create monopolies or restrain trade, and left it to the courts, without a word of direction or instruction, to determine what contracts did create monopolies or restrain trade, and what did not.

It cannot be said that Congress has done an unwise or imprudent thing, and that if calamity occurs the fault lies at its door. It has prohibited nothing but contracts and combinations to create restraints of trade and monopolies. These, when properly defined, are, beyond question, public mischiefs and ought to be prohibited. If any useful thing becomes stricken down by the law, it must be the result of some erroneous interpretation.

The first question we design to consider is whether the agreement violates any of the provisions of the act referred to. To this end it is of much importance to have in mind the particular nature of the subject with which this act deals, and how that subject has heretofore been treated in law and legislation.

It is immediately obvious that Congress conceived itself. to be dealing with acts supposed to be productive of injury to the public, and of injury to such an extent as to justify repressive legislation.

We next observe that it is not contracts only of a certain character which are condemned, but that they are coupled together with certain other acts, presumably of a similar nature or tendency, namely, combinations or conspiracies in restraint of trade, and monopolies, or combinations or conspiracies to monopolize. Contracts, therefore, are dealt with, not so much as contracts, but as one form of acts relating to trade and commerce assumed to be injurious in their tendency and effect.

That contracts of a certain class may be opposed to a sound public policy has been recognized in the law from a very early period. The grounds or reasons of policy upon which they are held void or illegal are very numerous and varied, but a class embracing numerous instances is formed of such as are supposed to have an injurious effect upon trade or commerce; between these, however, there is quite a marked distinction observable in the way in which they are treated in the law. One description embraces simply ordinary business transactions, where parties make agreements with each other for supposed mutual profit and advantage, a breach of which would result in pecuniary loss or damage to the one or the other, and a demand for redress. In such cases the parties expect and intend to enforce the contract, and look to the ordinary legal remedies as the means of enforcing it. Contracts whereby a business is sold and the seller covenants that he will not thereafter carry it on, or where a man takes an apprentice with an agreement that he will not set himself up in opposition to his master in trade, supply familiar instances of this character.

Inasmuch as such contracts would not be entered into unless it was believed that the law would afford redress in case of a breach of them, the repressive purposes of the law, where they are supposed to be opposed to public policy, are, in general, fully satisfied by declaring them void and denying redress, and this is usually the extent of the notice which the law takes of them.  There is no occasion for criminal legislation, both for the reason that there is not present, ordinarily, any criminal purpose, and if there were, repression is sufficiently accomplished without a resort to it.  The doctrine respecting contracts of this character belongs therefore to the law of contracts, and the treatises on that law usually embrace a chapter devoted to it.

But there is another and much smaller description of contracts supposed to be injurious to trade of quite a different character.  They are not, properly speaking, business transactions.  They do not involve the sale, leasing or exchange of property, or the hire of services; nor does a breach of them usually result in distinct and ascertainable pecuniary loss.  They are not, indeed, entered into by parties in different interests, as in the case of buyer and seller, one of which expects to gain something from the other, but by parties in the same interest having in view an object for the common good of all; nor do the parties to them generally look to, or rely upon, any legal remedies to secure obedience to them.  They spring out of circumstances which impress the parties to them with the belief that they have a common interest, or that it is expedient to create a common interest among them, and seek to control or regulate the conduct of each other in relation to business.  Instances of this description of agreement are found where laborers, or employers, unite, in the form of agreement, to regulate hours of labor, or prices, or where merchants, or tradesmen, combine to transact their business in certain prescribed ways, or to establish uniform prices for their goods, or to suppress, or regulate, competition among themselves; or where a class of producers or dealers combine together to control a product, or a business, with a view of imposing upon others their own terms as to prices, or other incidents of the business.

The marked distinction between these cases and the ordinary business transactions first spoken of is, that in the latter there is a difference of interest, sometimes regarded as a hostility of interest between the parties, each seeking to gain the utmost from the other; whereas, in the former, the parties are in the same interest, each seeking the same end. The term "contract" does not well express this sort of agreement. It is a uniting together for a common purpose — a combination — or, when thought to be of an objectionable character, a conspiracy. Such unions always suppose agreement, but it need not be in writing; where it is in writing it is often called an agreement, or contract; but, in giving it this name we should not lose sight of its real character. In reality it is simply an act, and innocent, or guilty, according as the law may be inclined to regard it.

It is manifest that where the law does regard it as mischievous, and to such a degree as to call for repression, it is not enough to simply declare it illegal. The practice may, nevertheless, be persisted in, and as it does not rely for its efficacy upon legal remedies, the mere withholding of such remedies may be ineffectual. The action, therefore, which law usually takes in respect to such so called contracts is in the form of prohibition and penalty, and the subject belongs not to the law of contracts, but to the criminal law, where it is usually dealt with under the head of conspiracy.

We do not mean by the above observations that there may not be instances which partake, to a greater or less degree, of the qualities of both the classes above mentioned; but the distinction between them is so constant and pervading that it will be at once recognized.

As a conclusion to what is said we desire to point out that the legal doctrine and policy to which this Anti-Trust act belongs, is manifestly the one last described. The circumstance that contracts are grouped together with combinations and conspiracies and made the subject of criminal treatment, shows this very plainly.

The ineptitude of some of the language of this legislation is quite apparent. Undoubtedly the object of Congress was to

reach that class of supposed mischiefs which flow from combinations. But the great bulk of the cases, probably nine tenths, in which courts have felt called upon to say anything about contracts in restraint of trade, has been the business transactions first alluded to in which an agreement has been entered into, not to exercise a particular calling, as where the keeper of a well-patronized tavern sells out his establishment and good will, and covenants not to further carry on the business. Such agreements at the common law have been held valid or void according to the supposed reasonableness of the covenant; but, surely even when void, there was nothing about them calling for the intervention of the criminal law. And yet this statute bunches the valid and the void all together, and makes them all criminal, when probably there was not the remotest intention to make any of them criminal.

These observations, of course, fully admit that the particular agreement or combination against which this action is aimed, would be, assuming that the act covers contracts between railroad companies, obnoxious to the penalty imposed by the act, provided it were, in fact, in restraint of trade or commerce between the States. That it is, in fact, in restraint of trade or commerce must be shown before this action can be maintained, and this is the proper subject for discussion in this action. This question is broadly open and unaffected by any decision of this court, and we expect to be able to show that the agreement is not only not in restraint of trade and commerce, but highly beneficial to both; that Congress has never declared, or intended to declare, it criminal, and that it is deserving, not of judicial condemnation, but of judicial encouragement and approval.

Unless the act is subject to the interpretation hereinafter maintained, it is open to grave objection on constitutional grounds, which will be dealt with by other counsel.

Having presented this preliminary matter, *Mr. Carter* argued the following points.

I. The court has no jurisdiction to entertain this suit, unless it can be found in the provisions of some statute.

The bill sets forth simply the commission of a misdemeanor,

and an intention on the part of the defendants to repeat the offence. No principle of the public remedial law of America or England is more fundamental than that the ordinary administration of criminal justice by the ordinary courts of common law, is sufficient for the repression of crime, and exclusive adhesion to it necessary for the protection of the citizen.

II. The Anti-Trust act contained provisions purporting to create a jurisdiction in equity to give relief by way of injunction; and, perhaps, the decision made by this court in the suit of the *United States* v. *The Trans-Missouri Freight Association*, should be regarded as a determination that the Attorney General was at liberty in case of any violation of the provisions of the act to file a bill for an injunction, although it would seem necessary, upon familiar principles, to make out a case for equitable interposition, in order to justify an appeal to the equitable jurisdiction thus created. But so far as it is sought to maintain the present action on the basis of an alleged violation of the provisions of the Interstate Commerce act, no support can be derived from the decision above referred to. No such jurisdiction in equity is given by that act. And by implication, at least, it is withheld; for in certain cases specially mentioned in sections 6 and 13, jurisdiction is expressly given to courts of equity to grant injunctions. If it is not given in other cases it must be taken to be for the reason that it was not intended. *"Expressio unius est exclusio alterius."*

III. A clear understanding should be had at the outset, of the meaning of the terms with which we are dealing. The class of contracts condemned by the Anti-Trust act is defined by the effect they have upon trade or commerce. They are such, and such only, as have the effect of restraining trade or commerce. The actual effect which the contracts have upon trade or commerce is the material consideration which determines whether or not they are included within the class.

This may seem self-evident, and indeed is so. But the possible suggestion might be made that there is a class of contracts, called, or named, "contracts in restraint of trade," and that the statute relates to these irrespective of their real and true effect. There is no foundation for such a suggestion. There

is no class of contracts known to the law by the name of contracts in restraint of trade irrespective of their actual effect upon trade. Whenever, heretofore, the point has been made in the case of a particular contract whether it was in restraint of trade, it has been determined by an inquiry as to its actual effect upon trade. No suggestion would have been indulged that it was valid or void according as it might, or might not, be called or styled a contract in restraint of trade.

Moreover we are dealing with the criminal law, which never classes acts and makes them punishable under arbitrary names, without regard to their supposed effects, as being actually mischievous or otherwise. This would be putting innocence on a par with guilt.

IV. There seems to be no room for doubt concerning the meaning of the term " in restraint of trade or commerce." To restrain is to hold back, to check, to prevent, and thus to diminish. It is injury to trade or commerce which the act is aimed to prevent. Unless, therefore, a contract injures and thus diminishes, or tends to diminish, trade or commerce, it cannot be deemed as in restraint of trade or commerce.

V. The agreement under which The Joint Traffic Association was formed, and the carrying out of which is sought to be enjoined, is not a contract in restraint of trade or commerce within the meaning of the act of July 2, 1890.

[Over one hundred pages of appellant's brief are taken up with the discussion of this point. The following synopsis of its reasoning was filed by counsel.]

The bulk of the whole discussion, so far as respects the Anti-Trust act, is contained under this Fifth Point, and the line of argument pursued is substantially as follows: (1) That no restraint is directly, or in terms, imposed upon trade or commerce; that all the members of the association will, as the agreement assumes, continue in business, doing the utmost they can, and in competition with each other; that whatever restraint is imposed by it is imposed simply upon a single feature of this competition; that, competition and trade not being identical with each other, a restraint upon competition is not necessarily a restraint upon trade. It is admitted, how-

ever, that a restraint upon competition may be a restraint upon trade; but it is asserted that whether it is so or not, in any particular case, depends upon the nature and effect of the restraint imposed in such case.

(2) The argument thus reaches one of the main subjects of discussion, namely, what the effects of competition in trade are; when they are good; and when, if ever, they are bad; and how such restraints have been regarded in public economy, law and legislation. This subject is treated at first generally, without reference to the particular effects of competition in the business of railroad transportation.

(3) It is then pointed out that the particular field of discussion in the case has been, by what precedes, fully disclosed, namely, the effects of restraints upon competition as restraining, or not restraining, trade and commerce, and a particular proposition, substantially equivalent to the main one, is stated as follows:

"The agreement in question, as a whole, and, particularly, so much of it as affects competition, is in the highest degree promotive of trade and commerce." The discussion on this head pursues the following course:

(a) It begins with a statement of "the origin, development and present condition in this country of the business of railway transportation," and shows that by the deliberate policy of all our governments, state and National, business has been, from the first, subjected to the severest involuntary competition, and it points out the ruinous results to which such competition leads when it takes place on rates, and aims to show that such results can be arrested, or mitigated, only by allowing the competing parties to displace the strife by some form of agreement. (b) This discussion is proceeded with by pointing out what the main requisites of a good railway service are, and how they are affected by railway competition in rates. It aims to show that such competition, by making uniformity in rates impossible, makes it impossible to secure any of these essential requisites, and that they can be secured only by some form of concerted agreement between the parties.

(4) The subject of agreements between railway companies and coöperative traffic associations being thus reached, a sketch is made of their origin and development down to the time of the passage of the Interstate Commerce law, and it is shown that the most efficacious form of agreement down to that time had been found to be that of pooling.

(5) The Interstate Commerce law and its effects are then discussed, and it is shown that one of its main objects was to bring about, so far as Federal legislation could accomplish it, uniformity in rates, and thus put an end to the practice of discrimination, and attention is called to the incidental feature of the law which prohibited pooling agreements. It is then shown that the effect of that law was to increase and aggravate the very evils which it was designed to remove. Pooling being prohibited, the most effective method for securing uniformity in rates could no longer be employed, and ruinous competition, with every form of discrimination, followed, and to these evils was added the unendurable aggravation that the practices which the law could not prevent were, nevertheless, converted into crimes.

(6) It is then shown that the necessity was universally felt for some form of concerted action which would put an end to these deplorable conditions and that the present agreement was the result of an earnest effort in this direction.

(7) An analysis of the agreement is then made, and it is pointed out that it is not aimed against competition in general, but assumes that such competition will still continue actively and earnestly on every point except that of rates.

Its precise effect upon competition in rates is dealt with, and it is shown that while its object is to secure uniformity in rates by inducing competing companies to consent to such uniformity, it does not purport to require it or compel it. That it does not really, or in any proper sense, seek to restrain competition at all, but aims to render competition open, honest and lawful, so that the business of railway transportation may be conducted in conformity with the requirements of the Interstate Commerce law, and without the daily commission of crime. It shows that, to this end, it is necessary that each railroad

company should first establish its rates and should adhere to them for a reasonable period, which is fixed at thirty days, in order if it intends a change that it may give reasonable notice of its intention in time to enable the competing parties to meet it, and to shape their own conduct accordingly ; that this is absolutely the only restraint upon competition effected by the agreement, and being only slight and temporary, and necessary in order to enable competition to be open and lawful, cannot be regarded as a restraint upon trade.   It admits that one of its main objects is to secure what the Interstate Commerce law sought to secure, uniformity in rates, but its method of effecting that result is, not by a compulsory agreement, but by taking away the motives to ruinous, secret and unlawful competition in rates.   It also points out the many other beneficial provisions of the agreement by which it is sought to make the railroad transportation of the country regular, orderly, safe and effective.

(8) It further seeks to emphasize the beneficial purposes of the agreement by showing that every great industry in which the coöperation of many different proprietors and agencies is required, necessarily calls for a system of regulation which must be supplied either by the action of government, or, in the absence of such action, by the voluntary action of those who are engaged in it, and it pronounces the association as " an institution for the regulation of transportation business in those respects in which the State, either from lack of jurisdiction, or because it deems that the regulation could be best devised and administered by the railroad systems themselves, has chosen not to regulate it."

(9) Throughout this part of the argument the central proposition is that of the absolute necessity for some agency by which uniformity in rates may be brought about, and a uniformity not only in the case of merchandise shipped from the same point to the same terminus, but also in the case of merchandise shipped from, or to, any points in any way competing. So long as competition in rates exists different men and different places will necessarily be put up, or pulled down, enriched or ruined, as one railroad company may think it to be

for its interest to make lower rates than another, and without regard to comparative skill, industry or other natural advantages which furnish the true and only field for useful competition. Railway transportation is a public function, and absolute neutrality in relation to the multitudinous competitions of life is an essential condition of its just discharge. This neutrality can be secured only by uniformity in rates. If this is not secured by Government it must be brought about by some private agency. It cannot be secured by governmental action, because the Government has committed the business to private hands. The Interstate Commerce law had this uniformity for its prime object; and went to the limit of Congressional power in the effort to accomplish it. The prime object of the present agreement is to supplement the effort, not by compulsorily restricting competition, but by taking away the motives to it. It is asked whether it is possible to regard an organization formed to effect an object which the law and public policy unite in viewing as essential, but which Congress cannot by law reach, as a restraint upon trade? It is believed that when this single subject is considered in all its various relations, it is, of itself alone, decisive of the whole controversy.

(10) The important matter of the classification of freight is taken up and considered, and it is shown that the great end of uniformity in rates cannot be attained without a system of classification; that classification is only a part, although a necessary part, of rate making; that its only object and purpose is to make uniformity in rates possible; that it has never been attempted, except as part of an effort to bring about such uniformity, and can never be perfected, or even preserved, except upon the condition of such uniformity.

(11) The general usefulness of the organization formed by the association is dwelt upon by calling attention to the multitude and variety of subjects upon which it is daily engaged, and especially to its constant occupation with the question, how any particular rates which may happen to have been established, or which may be proposed to be established, affect different places and different merchants or manufacturers en-

gaged in the same business, and who are in competition with each other, whether they may be a few miles or hundreds of miles apart. It is asserted that the association becomes the practical arbitrator in cases where the Interstate Commerce law cannot operate between competing merchants and manufacturers, and between competing places, as to what rates even-handed justice to all requires; that from the nature of the case and the interest of the railroads themselves, no rules can be adopted for decision of such questions except those of justice and equality, and that it is practically impossible that it should be made a medium of monopoly, or for the exaction of anything more than reasonable charges; and that this is proved by a reference to the course of railroad charges during the whole period, embracing many years, in which such agreements have existed, the fact being that they have continually declined from the rate of about three cents a ton or mile to less than one cent a ton or mile, a rate lower than that of railway transportation in any other quarter of the world.

(12) The argument then refers to the matters of fact which were involved or assumed in the foregoing discussion, and justifies whatever assumptions have been made in the following ways: (a) That, by the very nature of the case, they are matters which must necessarily be true, because they are the results of the operation of the familiar and well-known laws relating to industrial pursuits. (b) Because they have that notoriety which requires a court to take judicial notice of them. (c) Because they are fully established by averments in the answer admitted by the appellant in setting down the cause for hearing upon bill and answer. (d) By the declarations, repeated in multiplied forms, of the Interstate Commerce Commission, the great public agency which has such supervision and control over the business of railway transportation as Congress can assert. Copious extracts from these declarations are set forth.

(13) These extracts and other proofs thus referred to are again declared to stamp this association as one instance, of which industrial life furnishes a multitude, where industrial

interests of great magnitude are subjected to private regulation, and for the reason that the State recognizes, and always has recognized, the fact that such regulation is far more effective over a large range of subjects than any which the State itself could devise and enforce. This statement is confirmed and illustrated by reference to many different instances. (*a*) To the multitudinous associations among workmen and employés of various descriptions, all based upon agreements far more in restraint of competition than any contained in this instrument. (*b*) Similar unions among the employers of labor. (*c*) To the numerous Commercial, Stock and Produce Exchanges and Boards of Trade, all of which prescribe rates of commission and for compensation for various services, and forbid any departure from them, and are far more restrictive of competition than any provision in the agreement in question.

(14) The question is submitted whether trade is in any way restrained by the agreements between laborers and employés, or those between the employers of labor, and it is answered by saying that the final and general results, notwithstanding occasional abuses, are greatly to increase the efficiency of labor and the amount of work done, and to elevate the character of the laboring classes. The same question is asked in respect to Commercial Exchanges and Boards of Trade, whether they restrain the business with which they are conducted; whether there is less buying or selling of goods in consequence of commissions or other charges being fixed at particular sums. It is answered by saying that, as every one knows, these are all agencies by which the number and magnitude of business transactions is enormously increased.

The same question is put in relation to the operation of the present agreement, or of any agreement tending to secure uniformity in railroad rates and the stability, certainty and safety of railway transportation; and it is asked whether, in consequence of such agreements, the business of railway transportation or the exchange of commodities is in any particular diminished, and whether it is not, on the contrary, prodigiously extended and enlarged.

(15) Under general subdivision V the conclusion to which the foregoing line of argument leads is drawn in these words : " That the agreement which this action seeks to condemn is not by reason of any restraint effected by it upon competition, or otherwise, a contract in restraint of trade or commerce, but is on the contrary highly needful to, and promotive of, both."

Its necessity to beneficial purposes, as thus established, is then separately pointed out by way of summing up : (*a*) Its necessity to stability in rates. (*b*) Its necessity to uniformity in rates and to prevent unjust discrimination. (*c*) Its necessity to secure the general benefits of harmonious coöperation in classification and interchange of traffic. (*d*) Its necessity as a supplement to the Interstate Commerce act, and in order to make the objects of that act attainable. (*e*) Its necessity for the prevention of crime, for its punishment when committed, and for the prevention of perjury, committed in order to conceal crime.

VI. If the Anti-Trust act is interpreted as forbidding agreements, such as the one under discussion, one of three alternatives must necessarily follow. (1) That all railroad transportation be abandoned; or, (2) The consolidation of all competing railroads under a single ownership, either governmental or private; or, (3) That all competing railroad business must be carried on in constant and daily violation of criminal law. Of these alternatives neither the first or the second can be contemplated as possible. Railroad transportation cannot be abandoned, and no governmental ownership can, under present, or any probably near future conditions, be brought about. We have no sovereign government possessing the requisite powers. It is the third alternative which must follow.

VII. These positions are fully supported by the weight of authority.

VIII. The agreement is in no manner in violation of the provisions of the second section of the act. It creates no monopoly, nor is it an attempt, or conspiracy to monopolize.

IX. In the attempt, made by the bill, to array every possible objection to the agreement, there is an evident purpose to

suggest that its eighth article, in connection with other subsidiary provisions, constitutes pooling, and therefore is a violation of section 5 of the Interstate Commerce act. There is no foundation for such a charge. The agreement in no manner violates any provision of the Interstate Commerce law.

*Mr. E. J. Phelps* for the New York Central and Hudson River Railroad Company, appellee.

I. As the case is set down for hearing on bill and answers, no fact alleged in the bill can be taken as true if denied in the answers, and every fact alleged in the answers must be taken to be true if responsive to the bill. The facts on which the case stands are therefore to be found exclusively in the answers, either in the admissions or in the responsive averments which they contain.

II. The denials in the answers completely negative all the charges of illegal intent on the part of the defendants which are contained in the bill, unless they are found to result necessarily from the terms of the agreement itself.

III. Whether the agreement by its terms violates the Federal law, depends entirely on the inquiry whether it conflicts with any statute of the United States. The bill is not based upon any statute, but proceeds apparently upon common law grounds. No statute is referred to, or charged to have been violated.

IV. The only statutes of the United States that are claimed to be infringed by the terms of the agreement, are the Interstate Commerce act, of February 4, 1887, amended by acts of March 2, 1889, February 10, 1891, and February 8, 1895, and the Anti-Trust act of July 2, 1890.

V. The agreement violates no provision of the Interstate Commerce act. The only provision in that act that is claimed to be infringed, is contained in § 5, which prohibits "pooling." "Pooling" means a division of the money earnings of traffic, which this article does not contemplate.

VI. Even assuming that this clause in the agreement can be construed into a violation of the 5th section of the Interstate Commerce act, this suit would not be maintainable, be-

cause it is unauthorized by that act, and precluded by its express provisions. This court has no power to grant an injunction, either interlocutory or upon final decree, at the suit of the United States Government, against the commission of a crime, where no other grounds for the injunction exist except that the act sought to be enjoined is an offence; unless such power is specially conferred by statute. No such power is granted.

VII. The Anti-Trust act of July 2, 1890, does not apply to the business of railway transportation. It will be claimed that the decision of this court in the case of the *Trans-Missouri Association*, 166 U. S. 290, is decisive upon this point, as well as upon the further question whether the agreement here under consideration is a violation of the provisions of the Anti-Trust act. It will be found on comparison that very material differences exist between the agreement shown in that case, and the case that is presented here. So that the decision there is by no means controlling in the present case. These points of difference are clearly pointed out in the brief of Mr. Edmunds, and need not be restated. But we conceive it not to be improper, so far as it may be necessary, respectfully to ask of the court a reconsideration of the conclusions reached by the majority of the judges in that decision, which overrules the judgment of six United States Circuit and District Judges who sat in the different stages of that case and this.

The argument in opposition to it has been so fully, so clearly and so forcibly presented in the dissenting opinion of Mr. Justice White, that it is hardly possible to add to it, nor is it necessary to repeat it.

VIII. Assuming for the purposes of the argument, that the Anti-Trust law does apply to railway traffic contracts, no provision of that law is violated by the agreement now under consideration.

The prohibitions of the act are two: 1. Against contracts, combinations or conspiracies in restraint of trade or commerce. 2. The monopoly of, or the attempt or combination to monopolize any part of the trade or commerce of the States, or with foreign nations.

The agreement in this case is not ": in restraint of trade or commerce." The theory of the bill appears to be that the agreement comes within this description, because .it tends to restrict competition, and because any agreement that restrains competition is " in restraint of trade." Both these assumptions are erroneous, the one in fact, the other in law. The agreement does not restrain competition to any such appreciable extent as would justify an injunction, except that competition. which is unlawful because it is secret.

Assuming, against the fact, that a certain restriction of competition is the necessary result of this agreement if it is allowed to proceed, it plainly appears by its terms to be only such restriction of competition as is necessary to secure " just and reasonable rates."

By the Interstate Commerce act all rates are required to be " reasonable and just." Every unjust and unreasonable charge is made unlawful. Schedules of rates, as has been pointed out, are required to be published and kept open to public inspection, and to be filed with the Commissioners; and not to be changed without due notice to the public and the Commissioners. Ample remedies, criminal and civil, are provided for the violation of these requirements, the enforcement of which is made .the duty of the Commissioners, and the companies are also made subject to the state laws regulating rates.

The precise question, therefore, under this clause of the Anti-Trust act, is whether a contract that produces a result which the Interstate Commerce act in terms authorizes and provides for, and helps to repress a practice which that act forbids, is for that reason a contract for the unlawful restraint of trade. Or, in other words, whether it can be made unlawful by a forced construction of the general provisions of one statute of the United States, for a carrier company to provide by a traffic contract for the maintenance of those " just and reasonable rates " which another statute of. the United States not only authorizes, but creates elaborate means for making permanent, and for preventing the secret changes of rates which the Interstate Commerce act prohibits.

It is the statutes themselves that have prescribed a defini-

tion of this clause of the Anti-Trust act, so far as it applies to railway traffic contracts, if it is held to apply to them at all, whatever its meaning as to other contracts may be.

That the just and reasonable rates of transportation which the Interstate Commerce act contemplates and provides for, are rates that are just and reasonable to the carriers as well as to the carried, cannot be open to doubt. The very words "just and reasonable" employed in that act, necessarily imply that meaning. They are words of comparison and relation, and unless the rights of both parties to a contract are considered, there can be no comparison. It would be preposterous to call a price just and reasonable, that was not so to one side as well as to the other. This is the construction which this court have given to the Interstate Commerce act in this very particular.

The validity of the agreement here in question must be determined, therefore, not merely upon the language of the Anti-Trust act taken by itself, but by that language considered in connection with the other statute of the United States which (if this applies) is *in pari materia*, and which deals with the subject so much more exhaustively, and in words so plain that there can be no ambiguity raised in respect of them. Granting that the Anti-Trust act in terms makes all contracts unlawful that are in anywise "in restriction of trade," however reasonable and necessary they may be, is that to be understood to invalidate a railway contract made to secure that, and only that, which the Interstate Commerce act as construed by this court recognizes as the right of railway companies to receive, and provides means to secure? It will hardly be claimed that the elaborate provisions of the Interstate Commerce act on the subject of reasonable rates are repealed by the Anti-Trust act. If both are to stand, as applicable to this case, they must be read together, the same as if their provisions were contained (so far as they refer to the same subject) in separate sections of the same act.

Quite aside from the provisions of the Interstate Commerce act, giving to the companies the right to just and reasonable rates, and to use proper means to maintain them, the same

result is reached under the principles of the common law. The term "restraint of trade" employed in the Anti-Trust statute has a common law definition. And as the act furnishes no other, that, upon the general rules of construction, must be taken to be intended. To make the agreement an infringement of this statute, it must, therefore, be one that would be void at common law. It is respectfully submitted on this point that in the construction of statutes the rule is absolutely without exception, that where a word or phrase employed has a well-settled common law definition distinct from its literal meaning, that is assumed to be the meaning intended, unless a different definition is prescribed in the statute. Even the Constitution of the United States, a political document of an entirely unique character, has been from the outset subjected by this court to this rule of construction.

Even if it should be held that the language of the Anti-Trust act forbids any contract in restraint of trade, however just, reasonable and necessary, the agreement here in question would not fall within the prohibition, because it does not tend to restrain trade or commerce, but rather to promote them.

A restraint upon excessive and unwholesome competition is not a restraint upon trade, but is necessary to its maintenance.

This view is so fully presented and discussed in the brief of Messrs. Carter and Ledyard, that further argument in support of it is not requisite.

There is no ground whatever for asserting that the agreement infringes the provision of the Anti-Trust act against monopolies.

The definition of the word "monopoly," both in its legal and its ordinary signification, is the concentration of a business or employment in the hands of one, or at most, of a few. That is the plain meaning of it as employed in the act. No feature of the agreement, in any view that can be taken of it, approaches this definition.

So far from tending toward the concentration of railroad transportation in fewer hands, it does not in any possible event withdraw it from a single road now in existence, nor throw the least obstacle in the way of the construction of others.

Its effect will be, if it is successful, not to diminish, but to increase transportation facilities, by preserving roads that might otherwise be driven from the field.

IX. If the construction of the Anti-Trust act which was adopted by the court in the *Trans-Missouri case* is to stand, it is respectfully insisted that the act, so far as thus interpreted and applied, is in violation of the provisions of the Constitution of the United States, since it deprives the defendants in error of their liberty and their property without due process of law, and deprives them likewise of the equal protection of the laws.

This point was not made on the argument of the *Trans-Missouri case*, because no such construction of the act was anticipated by counsel. Nor was it considered by the court, since it is an unvarying rule that no objection to the constitutionality of a law will be considered, unless raised by the party affected.

The question thus presented is not whether the act in general, or in its application to the many other cases to which it is obviously addressed, is unconstitutional, but whether the agreement here under consideration is one that may be prohibited by legislation, without infringing the freedom of contract and the right of property, which the Constitution declares and protects.

In the *Trans-Missouri case*, where the contract under consideration was similar to the one here in controversy, though far more open to the objections here urged, it was conceded, both in the majority and the minority opinions of the court, that its substantive character and purpose were such as the answers in the case aver and set forth. It was for this reason believed by the minority of the judges that it could not have been the intention of Congress that such a contract should be made a penal offence. But it was held by the majority that the language of the act admitted of no other construction. Though it was conceded in the opinion of the court that the arguments against that conclusion " bear with much force upon the policy of an act which should prevent a general agreement of rates among competing railroad companies, to the extent simply

of maintaining those rates which were reasonable and fair." And in the opinion of the minority of the court by Mr. Justice White, he remarks, after stating the general features of the contract, "I content myself with giving this mere outline of the contract, and do not stop to demonstrate that its provisions are reasonable, since the opinion of the court rests upon that hypothesis."

The accuracy of the statement we have made above, of the legal effect upon this case of the Anti-Trust act, as so construed, is thus both established and conceded, and the question distinctly arises, whether legislation having such a result is within the power of Congress.

That the operation of the act as thus interpreted does in fact, by prohibiting the contract here in question, deprive the defendants (whether rightfully or not) of both liberty and property to a very grave and perhaps ruinous extent, is not open to question. A just freedom of contract in lawful business is one of the most important rights reserved to the citizen under the general term of "liberty," for all human industry depends upon such freedom for its fair reward.

The use of property is an essential part of it, and when abridged the property itself is taken. Its use is abridged when the owner is precluded from any contract that is necessary or desirable in order to secure to him a just compensation for its employment. And when any class in the community is so precluded, it is to that extent "deprived of the equal protection of the laws." These are elementary propositions in constitutional law, and have been often asserted by this court.

In recapitulation of the points above presented upon the question of the constitutionality of the Anti-Trust act, if it is held applicable to the agreement in this case, we respectfully insist: (1) That the act deprives the defendants of both liberty and property, by forbidding a contract just and reasonable in itself, essential to the use of their property and the prosecution of their business, and never before held or claimed to be unlawful or wrong, and by which they only agree to do what they have a right to do. That no such contract can be prohibited by law without a violation of the

constitutional provision, whatever advantage to the public in keeping down rates of transportation may be expected to result from it. And that in attempting such a prohibition, the case contemplated by the Constitution is distinctly presented, in which the legislature deems that a public benefit is to be effected by depriving the citizen of his liberty or property without due process of law.

(2) That even if such a deprivation could be justified in any case, the public good in this case does not in any sense require it, because (*a*) Those intended to be benefited are not the public, but only one class of the public who are seeking a business advantage over another and much larger class, which is equally entitled to protection. (*b*) Even if such class is held to constitute the public, it is not entitled to the suppression of all restriction upon competition. Because such a suppression would be a plain and oppressive violation of the equal rights of the other class, inasmuch as it would compel the latter to serve the former by labor and property without just compensation. (*c*) The legislation in question is not necessary, even if it is admissible. The complete suppression of all the restriction upon competition to which the public has a right to object, is already effectually provided for by full and careful Congressional legislation, in which no defect or insufficiency can be pointed out; so that the further suppression now proposed only extends to those restrictions, just and reasonable in themselves, to which the public have not a right to object. And even without that or any legislation, it would be utterly impossible under existing facts, notorious and undisputed, for railway companies to restrict competition to a degree that would result in any injury to the public. (*d*) That if all restrictions upon competition were prohibited, the result, instead of a public advantage, would be a public calamity, and would injure rather than benefit the very class in whose behalf it is contended for.

(3) That even if it were admitted that further legislation against restrictions upon competition was both constitutional and necessary, the provisions of this act, in forbidding all such restrictions, are not justly adapted to the only end that is

admissible on public policy. If this one is of that character it must fail, but if not, it cannot be made unlawful because it is unnecessary. Few special contracts would be necessary if all parties concerned in the transactions to which they refer would always do right.

*Mr. George F. Edmunds* for the Pennsylvania Railroad Company, appellee.

Before the agreement in question was made, the rates of each road had been independently and fairly established by itself, and duly filed with the Interstate Commerce Commission; and these rates were in truth just, reasonable, and in conformity with law in every respect, and were in full operation.

This is admitted by pleadings.

This being true, these rates could not have been either raised or lowered, under then existing conditions, without injustice to patrons or else injustice to those interested in the roads, including the people along their lines, as well as through shippers.

To have changed any of them would have been against justice and reason, disobeying the first commandment of the commerce law.

In this state of things the agreement was made. The preamble contains five distinct declarations, as follows:

(1) To aid in fulfilling the purposes of the Interstate Commerce act; to coöperate

(2) with each other and adjacent transportation associations to establish and maintain

(3) reasonable and just rates, fares, rules and regulations on state and interstate traffic; to

(4) prevent unjust discrimination, and to secure the reduction and concentration of agencies

(5) and the introduction of economies in the conduct of the freight and passenger service.

Every one of these declarations is admitted to have been true in all respects; and it is admitted that there was no other.

purpose, and no secret or covert design in respect of the subject. The preamble thus became, certainly as between the parties to it, the constitutional guide in the interpretation of the body of the contract.

The parties next declare that they "make this agreement for the purpose of carrying out the objects above named."

The first six articles of the contract provide for organization and administration, in respect of which no criticism has been suggested, except as to section 5 of Article V in connection with the Solicitor General's contention in regard to Article VII.

Article VII is the first one that is assailed in respect of its fundamental character. It is the fundamental one in regard to rates. If it violates law, it is bad, and must not be put in execution. If it provides for the fullest obedience to law and promotes trade, it must be upheld.

The first section provides:

"SECTION 1. The duly published schedules of rates, fares and charges and the rules applicable thereto now in force and authorized by the companies parties hereto upon the traffic covered by this agreement (and filed with the Interstate Commerce Commission as to such of said traffic as is interstate) are hereby reaffirmed by the companies composing the association, and the companies parties hereto shall, within ten days after this agreement becomes effective, file with the managers copies of all such schedules of rates. fares and charges, and the rules applicable thereto."

This section is the immediate and affirmative act of the association. Its essence is that all parties agree to abide by the preëxisting just, reasonable and lawful rates then on file with the Interstate Commerce Commission. It has not been contended by the learned Solicitor General that this section is contrary to law. It is submitted with confidence that no such contention can be made, and that if the association agreement had stopped there, the agreement would have been simply one to stand by just and reasonable rates independently fixed, on file with the Interstate Commerce Commission, which would be agreeing to do the very thing that the plain

words of the statute commanded should be done. The commerce law does not demand competition; it only demands justice, reason and equality. Every one of its clauses is devoted directly to these ends; and the competition that produces departure from the reason and justice and equality that the act requires violates the essential principle upon which it is founded.

I take it to be plain that if these thirty-one defendants had united in an engagement to truly and faithfully adhere to and carry out in their respective conduct all the requirements of the commerce law, and had agreed to the imposition of penalties for infraction, it would be manifest that they had not contracted to restrain trade, either in a general or a partial sense, or any sense whatever. In the instance of this first provision of the agreement, they have engaged to do that very thing and that very thing only in the form of specific language referring to a specific and existing just, reasonable and lawful state of things which they were then acting upon.

The second section of Article VII is the one upon which the principal assault of my learned brother on the other side is made. He maintains that the language used in describing the powers and duties of the managers is intended to be evasive and to conceal its real purpose, and to make the managers the absolute masters, subject to an appeal to the board of control (being the presidents of all the roads), of the changing and fixing of future rates. The first answer to this is that the pleadings distinctly admit that there was no evasive intention, or other unjust purpose, in any part of the arrangement. It is, therefore, not just to maintain what the record admits to be untrue.

But whatever construction or implication may exist in respect of the language of this section, it is sufficient to say that the very next section of the same article declares that

" The powers conferred upon the managers shall be so construed and exercised as not to permit violation of the Interstate Commerce act, or any other law applicable to the premises, or any provision of the charters or the laws applicable to any of the companies parties hereto, and the managers shall co-

operate with the Interstate Commerce Commission to secure stability and uniformity in the rates, fares, charges and rules established hereunder."

Here is, in words as clear and specific as the English language is capable of, a distinct jurisdictional limitation upon the powers of the managers, as described in the preceding section, and in terms the clause provides that the powers conferred upon the managers shall be so construed and exercised as not to permit the violation of the Interstate Commerce act, or any other law, and so forth; and it commands the managers to coöperate to these ends with the Interstate Commerce Commission.

When the managers come to act, then, under these powers, how do they start? They start with a system of rates established, not by the agreement, but before it was made, and confirmed by the agreement, which were confessedly in conformity with and in promotion of the Commerce act, and which were absolutely just and reasonable. The managers are to have authority to recommend such changes in those rates and fares as, by the very words of the second section, may be reasonable and just and necessary for governing the traffic and protecting the interests of the parties. Reasonableness and justice is the first and fundamental condition of their starting to act at all, and it is declared that they shall not act otherwise than in conformity with the requirements I have already mentioned contained in the Commerce act. Can this be an authority to restrain trade under any definition of the word "restraint"? The only restraint is a restraint against a violation of law by the managers in agreeing upon unreasonable and unjust rates against the requirements of the Commerce act. If we assume that the restraint of trade mentioned in the Trust act may be a restraint of innocent and just proceeding, can any one maintain that it makes illegal an agreement not to violate law, but to obey it?

It was obvious when this agreement was made that rates then existing and being in all particulars reasonable and equal, might, in the course of changes in production, trade, and under other conditions over which the railways could have no control,

become unjust, unreasonable and inapplicable to the new conditions, and that in such case. both public and private interests would require that readjustments should be made in order to bring the rates into conformity with what reason, justice and law should require under such conditions. It was to provide for this that sections 2 and 3 of the seventh article were inserted. As I have said, they were inserted in such clear language that it would be impossible for the· managers to agree upon any rates in lieu of the just one then existing, that were not, in the same sense and to the same extent, just, reasonable and for the public interest, as those then existing. The managers must act in that way and to that end, or else they were forbidden by the very terms of the agreement to act at all.

If the managers, contrary to their authority, should have agreed upon a new rate which any one of the independent roads thought to be wrong in itself as being unreasonable and not in conformity with the requirements of the article and of law, that company, or any number of companies affected, could lawfully and justly (as would be its bounden duty) refuse to conform to the rate of the managers. But it is asked, would not the road thus refusing be subjected to the fines and forfeitures provided in another part of the agreement, and would not it be turned out of the association? I answer emphatically, no. If any such thing were attempted under the circumstances named, the company could defend itself in a court of justice against any such wrongful exaction, and could compel the managers and its associate roads to obey the contract, and to give it its just equality of treatment that it was before entitled to. The Commerce act itself in terms requires the same reasonable and just conduct by railways towards each other as it does in their treatment of their customers and the public. I most earnestly maintain, therefore, that the whole and every part of Article VII is perfectly valid under any possible construction of the language of the Trust act, as well as in perfect conformity with and in aid of the Commerce act.

I may as well here compare the provisions of Article VII, which contains the great leading feature of the whole agree-

ment, with the agreement in the *Trans-Missouri case.* The difference is broad and fundamental. In this case, as I have shown, the rates agreed to be adhered to in the first section of Article VII had already been independently established, were, in fact, reasonable and just, were on file and inferentially approved by the Interstate Commerce Commission, and they had been assailed by nobody, and the whole trade of the country affected was proceeding under them with advantage to the shippers, to the people along the lines of the roads, to the railways themselves, and to the general interests of the country. It was an engagement to stand by that state of things and for the express purpose of continuing that happy state of things — exactly those that the law requires — that this engagement was made. Turn now to the Trans-Missouri agreement on the same part of the subject. That agreement did not propose or profess to stand by any then existing rates, it did not indicate that the rates then existing were just or reasonable, but it proposed to put into the hands of its managers the power to establish *de novo* reasonable rates, etc.; and, in the very words of the agreement, for the purpose of mutual protection, and for nothing else.

The Trans-Missouri agreement imposed no restriction upon the discretion of its rate-making board; it did not impose and did not, evidently, intend to impose the distinct barriers of the law between the powers of its rate board and the people and any one of the roads concerned. It did not profess to look to any other interest than the exclusive interest of the parties themselves; and it will be seen, on a careful study of it, that it was construed and constructed for the sole purpose of keeping up and increasing rates, instead of for the purpose (as in the Joint Traffic agreement) of keeping them just and in conformity with law, whether by reduction, increase or other readjustment.

Other essential differences are stated in my brief which I need not take the time of the court to enlarge upon.

These differences are illustrated by what the pleadings in the two cases show. In our case, the practical operation of the agreement has been to continue the same competition that

existed before. This is admitted. It has been to continue the same just and reasonable rates previously established, and to give a coöperative and advantageous service upon equal terms to everybody and of equal benefit to the whole public. The bill in the *Trans-Missouri case* alleged — there being, it will be remembered, no previously established rates that were agreed upon — that the parties had refused to establish and give their customers just rates. The answer did not meet the charge, but evaded it in the manner that the court will see stated in my brief. The practical construction by parties to contracts in their operations under them has always been considered an important element in determining the true character and meaning of the contract. What I have now stated shows the operating difference between the two contracts.

The next principal contention of my learned brother is that Article VIII of the agreement violates the Trust act by restraining trade.

The words of the article are as follows:

## "Article VIII.
### "PROPORTIONS OF COMPETITIVE TRAFFIC.

"The Managers are charged with the duty of securing to each company party hereto equitable proportions of the competitive traffic covered by this agreement so far as can be legally done."

This article provides that the managers shall endeavor so far, and so far only, as obedience to law — that is to say, conformity with the Commerce act and conformity with the Trust act — would permit, to secure equitable proportions of the competitive traffic to each one of the companies. It is a sufficient answer to my brother's contention to say that the very terms of the article do not require or invite or allow the managers to act under it at all otherwise than as the law shall permit. If, therefore, the Trust act condemns the effort referred to, then not to make the effort. If the Interstate Commerce act, either in terms or spirit, is adverse to such an effort the managers are not authorized to take a step. Does it violate the law to merely authorize an agent to do something in

the course of business so far, and so far only, as the law will permit?

But I contend that it was in conformity with law that each company should have an equitable proportion of the traffic. What does equitable mean? It means that which right and justice and the public interest require. What did justice and public policy require? And what does it still require in respect of the nine great lines connecting the western lakes and the valley of the Mississippi and the whole continent beyond with the Atlantic seaboard? Was it not just and necessary to public interest that each one of these roads, passing through great extents of country, and having along them populations and interests to whose welfare the existence of each one of these roads was necessary, should be considered with reference to the through traffic which should come from beyond? The question answers itself. It is obvious, then, that just so far as each road should be enabled to carry the through traffic that naturally belonged to it, by just so far the people along the whole length of its line would be benefited by increasing the income of the line and thereby contributing to its support and to its ability to make lower rates to all its people from one end of the line to the other. This provision of the eighth article then, I submit, was wholesome, lawful and necessary, and it was the very thing that one of the clauses in the Commerce act and the spirit of all its provisions required.

I may be allowed to say a word in respect of the objection that no one of the roads could change its rates without giving thirty days' notice, and therefore that this was a restraint of trade, in one sense or another. It will be seen on examining the agreement that each road had the absolute right, under the agreement and pursuant to its provisions, to change its own rates, and still continue a member of the association. This being so, it seems to me impossible to contend that any part of the agreement was any sort of restraint, unless it can be established that the thirty days' notice was too long. It is a matter of history that when the Commerce act was passed there was inserted in it the requirement that no rate should be raised except on ten days' notice, and none should

be lowered except on three days' notice, publicly displayed. What was the principle of this? It was that justice and fair play to customers and to the public and to all persons directly or indirectly interested in transportation required that sufficient and timely knowledge of changes in rates which, as we know, affect in a greater or less degree all commercial and productive transactions, should be had by every person and community interested. I suppose I may properly state it as a public fact, now known to everybody engaged in business, that the time fixed in the Commerce act for notice was much too short, and that unjust inequalities have arisen, again and again, from changes in rates by particular roads on such short notice that favored customers and favored localities, etc., would get advantages over others, in violation of the spirit and substance of the Commerce act. It was for the purpose, then, and with the effect of producing the widest fair play and equality among all persons, all roads and all communities, that this period of thirty days instead of ten was agreed upon. It was obviously right, and being right, it should not be condemned, unless the rigor of a law that cannot be otherwise construed and applied compels it.

I submit with sincere confidence, as it regards the provision I have just spoken of, as well as it regards all the other provisions of the contract, that, instead of being even a partial restraint of trade, they are all provisions of constraint in support of and in promotion of trade. Trade is a general word, and its operations, like all other operations that require cooperating and associating forces and arrangement, are advanced by, and indeed, cannot be carried on truly and honestly for public interests without checks and regulations, some of which may restrain and regulate the behavior of a particular element in the whole operation, and by doing so do not restrain but advance and promote the whole; just as, to take the simplest of illustrations that occurs to me, in mechanics, the safety valve of a locomotive, with its counterweight, regulates and restrains, or gives off, the accumulating steam in the boiler, in the first place conserving it, restraining it from escape, and in the second place, enabling it to escape. But all

this does not restrain the operations of the locomotive; it is necessary to its best and safest performance of duty. A hundred illustrations might be given.

My brother on the other side suggests that the clause in the agreement providing for abolishing soliciting agencies is a restraint of the trade. I have stated in my printed points my answer to this. I may add, however, that soliciting trade or ceasing to solicit trade is not trade itself, and does not belong to it, even as an incident. Wherever it is practised, it is practised apart from any act of trade; it precedes it, and sometimes leads up to it, and sometimes repels it. It was perfectly competent, therefore, and certainly wise, for these roads to agree to abolish such agencies, and to join, so far as it might be convenient to do for the information of the public, in having agencies at various important points to assist shippers and manufacturers in the most rapid and economical transmission of their productions. The plan, therefore, substituted for the old practice is one far more advantageous to the public who wish for honest and equal dealing than the old practice. But I submit that whatever character may be imputed to soliciting business, it does not fall within the authority of Congress to regulate it at all. While it is going on the business solicited has not reached the point of being interstate commerce, and cannot reach it until its movement has commenced, or is about to commence, definitely from one State to another.

I refrain from making any observations on the constitutional question arising if the Trust act is to be construed as forbidding innocent contracts promotive of public policy, which I have insisted upon in my printed points, for the reason that in the division of our subjects of discussion this matter is left entirely to my brother Mr. Phelps.

In respect of the meaning of the words of the Trust act, I beg to ask your Honors' careful attention to the suggestions I have ventured to make in my printed points. I need not enlarge upon them, and have only to call your attention, first, to the grammatical construction of the first section, and, second, to the citations I have made from law writers, showing a distinct and separate classification of the two phrases,

"restraint of trade in general" and "partial restraint of trade." If these writers are correct (as nobody doubts, I think, they are), and the two phrases were known and treated in the law at the time of the passage of the act as separate things, the one obnoxious and the other just and wholesome, then I respectfully and earnestly insist that the universal rule of construction requires that the words in the act shall be assigned to the first class, and not carried over into the second.

*Mr. Solicitor General,* for the United States, in conclusion.

I. It is claimed that because nothing has been done under the agreement, no irreparable injury has been or can be shown, and therefore no injunction lies. But the Anti-Trust law makes the agreement illegal and vests the court with jurisdiction to prevent violations of the act. The carrying out of an illegal contract will result in irreparable injury to the public, and this sufficiently appears from the provision of the law declaring the illegality and authorizing injunction proceedings.

II. It is insisted that an agreement in restraint of trade must restrain trade — that is, reduce or diminish it; that *trade* must be injured.

An agreement in restraint of trade may or may not diminish or reduce trade. The injury sought to be averted by prohibiting such agreements is the injury to the public. The stifling of competition, the creation of a monopoly, may increase the trade in the product controlled, but nevertheless to the injury of the public. To stifle competition is to create a monopoly and place the public at the mercy of the monopoly. The benefits resulting from cheaper products through monopolies have never been held by courts or legislatures as sufficient to overbalance the evils to the Government and people from the creation of monopolies. It is a question of method rather than result. Trusts and monopolies are forbidden in order to preserve competition, and thereby, as far as possible, freedom of action in industrial and commercial life.

III. It is said that competition is not trade, but a mere incident of trade; that what prevents competition does not

necessarily injure trade; on the contrary, to restrict competition may benefit trade, that the whole world is now groaning under competition; that the hard rule of the survival of the fittest bears heavily upon the mass of the people; that there is a spirit of unrest, of dissatisfaction, and that to avoid the effects of ruinous competition among employers and employés combination is the rule.

It may be conceded that the law of the survival of the fittest is a hard one; that the necessity of competition under existing conditions presses heavily upon the weak. But, after all, competition is not only the life of trade, but the underlying basis of our social and industrial life. There may be a better way, but we have not yet found it. Competition goes along with freedom, with independent action. This country was founded on the principles of liberty and equality. It sought to secure to every citizen an equal chance under the law. That is all the people have demanded or do demand — a fair show in the race of life. Undoubtedly there is unrest, dissatisfaction, tendencies to anarchy and socialism, but these result not from competition, but the throttling of competition by trusts and combinations, which seek to control production and transportation and dominate both workingmen and consumers. Against these the individual citizen protests. He does not demand *no* competition, but *fair* competition. Combinations of workingmen accompany aggregations of capital. Thus the masses are arrayed against the classes. If combinations of capital were prevented, if competition among employers of labor were enforced, the independent demand for labor from competing sources would tend to fair wages, such as prices might warrant.

IV. It is insisted that this agreement among railroads to prevent competition is not only innocent, but wise and salutary, because in the case of railroads competition is ruinous; that if competition reduces rates below the point of profit for any line, it must ultimately be bankrupted, for it cannot stop running nor can the capital invested in it be withdrawn.

But this argument applies to all great modern industries, in manufacture as well as transportation. Capital fixed in a

valuable plant cannot be withdrawn, nor can labor skilled in one industry be readily shifted to another. Both manufacturers and workingmen are subject to the contingencies of competition. The establishment of a new plant with modern improvements may destroy some old one, in which both have virtually risked their all. There are sections where a number of years ago it was profitable to make iron out of local ores. Millions of dollars were invested in furnaces. Workingmen skilled in iron-making settled there, and with their earnings bought property and built homes. Subsequently, in other sections more accessible to the markets, with cheaper ores, modern furnaces were erected and cheaper iron began to be made. The old furnaces could not meet the competition of the new. They had to be abandoned. Was it possible to withdraw the capital invested in them? Not at all. It was lost. The workingmen, too, suffered. They were thrown out of work, ran up debts, lost their homes.

Why are not men who put their capital or skill into a manufacturing plant just as much entitled to protection against ruinous competition as those who put their money or skill in a transportation plant? Why should the railroads be singled out from all the great interests of this country, and alone be authorized to combine and prevent competition and keep up prices?

Competition drives the weak to the wall, the fittest survive, but the greatest good to the greatest number results. The opening of new mines, the construction of new plants, the establishment of industries with improved methods of production and greater natural advantages, lower the cost of production of the commodity to the benefit of the public, but the person or corporation or region which cannot lower its cost of production to meet the new competition must suffer. Under competition the most improved plant, the best trained labor, the most economical management, the wisest business sagacity and foresight, is not only encouraged but demanded for success.

The best railroad, the one constructed and equipped and managed in the best way, will get the bulk of the competitive

business, and it ought to.   It can afford to carry the traffic at lower rates than the poorer roads, and it ought to be allowed to, in the public interest.   The poorer roads can get the business by putting themselves in shape to do the business.   Roads equally fitted to do the work will naturally divide the competitive business in equitable proportions.   Competition for traffic by improved service and lower rates will result, naturally, not in ruining the roads, but in building them up.   Under competition, the best road fixes the rate; under combination, the poorest road.   Is it just to make the public pay rates from Chicago to the East fixed by the poorest system protected by the Joint Traffic agreement?

V.   It is contended there is no restraint on trade, because the railways still exist with all their facilities for transportation, ready and willing to serve the public, and with no inducement for service weakened; that competition in every desirable aspect remains, the railroads being permitted to compete, but compelled to do it openly, under the provision that a deviation from the association rate cannot be made except by resolution of the board of a member and after thirty days' notice to the managers.

It is true the railways exist with their original facilities, but the inducement for improvement by cheaper methods of transportation is weakened, the motive for competition removed, the means of competition destroyed, and competition itself absolutely forbidden.   The natural result of preventing competition is to keep up rates.   An excess in rates over what would obtain under competition amounts in effect to a tax on the things transported.   This operates as a burden upon commerce, and a restraint of trade.

If a State should levy a tax on goods transported through it, this court would hold such an act unconstitutional, because it laid a burden upon interstate commerce.   Moreover, to increase rates and maintain them at a point above what would obtain under competition decreases the business of railroads but enhances the cost of it, and thus restrains trade or commerce.   Lower rates mean more traffic, both freight and passenger.   Higher rates mean less traffic.   It may be to the

interest of the railroads to increase the rates and lessen the traffic. The profits may be as much or more, but it is done at the expense of the public and to the restraint of trade.

VI. It is insisted that rates must be stable, not subject to change; that a manufacturer cannot safely make goods nor a dealer buy them unless he knows the rates for transporting them to market, and may rely upon these rates continuing; therefore agreements for maintaining rates at a fixed point should be encouraged.

It is obvious that the manufacturer or dealer must not only take into account the rates he will have to pay to market, but the rates his competitors from every quarter, by land and water, will have to pay. It is impracticable to attain a cast-iron uniformity of this kind, and neither the Interstate Commerce law nor the Joint Traffic agreement attempts it. Moreover, the agreement does not assume to prevent a change of rates. It virtually takes the power to change from the companies, but gives it to the managers of the association. For natural it substitutes arbitrary change. The protest against any change in rates is a protest against progress. The history of railroads shows a constant tendency towards cheaper rates. This has resulted from improvements forced by competition. The interest of the public lies not in maintaining but in reducing rates, and to effect such reduction competition is essential.

VII. Uniformity in rates is declared to be essential, and it is urged that the provisions of the Interstate Commerce law favoring uniformity cannot be enforced except by suppressing competition through this agreement; and, to illustrate the need of uniformity, it is said that without it an industry in Michigan equidistant from market with a similar industry in Indiana might be wiped out of existence by reduced rates in favor of the Indiana industry.

But neither the Interstate Commerce act nor this agreement would prevent the alleged injustice suggested. The case instanced involves a reduction in rates on local traffic, and the agreement only applies to competitive traffic. There is nothing in the agreement to prevent any member of the

association from changing the rates from local points; the jurisdiction of the association is restricted to competitive traffic.

The uniformity demanded by the Interstate Commerce act is uniformity in the treatment by *each* railroad of *its own* patrons. The second section prohibits a common carrier from charging one person more than another for the same service ; it does not prohibit a carrier from charging one person more or less than another railroad charges another person for an equal distance. The third section forbids a common carrier to give any undue preference or advantage to any person or locality over any other. But this only applies to the action of a railroad toward the people or the places served by *it*. And so, too, with reference to the long and short haul provisions in the fourth section.

The Interstate Commerce law declares that all charges must be reasonable and just. It provides no means for securing this desideratum except competition. The only method of stifling competition when the law was passed was the pooling agreement, and this was forbidden. Competition between railroads was preserved, and to secure the benefits of competition to all patrons of each road it was provided that the competition should be open and above board, so that the people might be advised of the existing rates, and each railroad was required to treat its patrons with uniformity, without discrimination and without preferences.

The object of the law was to secure the benefits of competition to all, and not permit a road to charge those shippers for whose patronage it does not have to compete excessive rates, while secretly granting lower rates to those shippers for whose patronage it has to compete. The competition was to be restricted to where it belongs; between the railroads and not between the shippers. If a railroad can afford to carry the freight of one shipper for a certain rate, it can afford to carry for the same rate like freight under similar conditions for every other shipper.

VIII. It is contended that uniform rates should be maintained on the trunk lines in order to keep the weaker roads in

operation for the benefit of the sections through which they run.

As I have pointed out, the agreement does not apply to local traffic. As to it, each road has a monopoly, with power to fix its own rates. The agreement applies only to competitive traffic between great centres. The argument, then, amounts to this, that the rates on through traffic are to be kept up in order to preserve the weak roads as going concerns for the benefit of the sections through which they run. What is this but to tax the many for the benefit of the few? It is not the function of Government to neutralize the advantages of locality. The people pay for these and are entitled to them. If I settle in a flourishing region on a good line, I pay for the privilege in the cost of the land, in taxes, etc. If I settle in an undeveloped region on a poor road, I pay little for either the privilege or the land, and must expect to help bear the cost of development.

IX. It is said that the Interstate Commerce act was passed to suppress competition and secure uniformity in rates.

It was not passed to suppress competition, but to preserve it and secure its benefits to all. Competition between independent lines was preserved and uniformity enforced to secure the benefit of this competition to all. Each carrier was required to treat its patrons with uniform fairness, without preference and without discrimination. The only effective arrangement used at that time by the trunk lines to stifle competition was the pooling agreement, and this was prohibited. It was recognized that competition would keep the rates reasonable, and the long and short haul provision was intended to secure to all points on each road the benefit of such competition. Unjust discrimination and undue preferences by a railroad among its patrons were prohibited. Thus the benefits of open competition were insured to all. The policy was — among the patrons of each road uniformity, but between the roads open competition.

X. The point is made that railways are public highways, and the furnishing of railway transportation a governmental function; therefore the Government should eliminate the ad-

vantage of locality by enforcing absolute uniformity in rates, or permit the railroads to do it by preventing competition and maintaining arbitrary rates.

It may be conceded that the furnishing of railroad transportation is a public function, and therefore the Government may regulate it.  Government, state and Federal, has done this, by forbidding the consolidation of competing lines, by prohibiting pooling contracts, and by making illegal all agreements in restraint of trade.

The absolute uniformity demanded is neither practicable nor desirable.  Absolute uniformity, extending to every rate, from every point, on every railroad, means absolute consolidation of control and absolutely arbitrary rates, and this is absolutely inconsistent with competition.  It admits of no competition.  The desirable uniformity is that which goes along with competition, and supplements it, and secures its benefits to all shippers, without distinction.  Each railroad should be required to treat its patrons — persons and places — with fairness and equality, without preference or discrimination.  It should not be required, however, to treat its shippers no better than other lines treat theirs.  On the contrary, it should be induced to treat its shippers the very best it can, and thereby make it incumbent upon competing lines to treat their shippers as well.  It should be induced to do this not only in rates but in service.  The rigid, cast-iron, arbitrary rule of absolute uniformity as between railroads, contended for by Mr. Carter, would logically prevent all competition, whether in rates or service.

If the railroads are not to be permitted to combine and prevent ruinous competition, and establish and maintain reasonable rates by arbitrary methods, then, it is said, they must either abandon transportation, or consolidate, or persistently violate the law.

There is a virtual consolidation of these roads now under the agreement.  The public is not interested in consolidation except as it affects competition.  The constitution and laws of many States prohibit the consolidation of railroads, but only of *competing* railroads.  Lines which do not compete may con-

solidate, and the public thus gains the benefit of broader and more economical administration. Railroads which compete may not consolidate, because it prevents competition and keeps up rates.

Public policy has demanded the prohibition of the consolidation of competing lines; for the same reason Congress enacted the antipooling section of the Interstate Commerce act. The pooling of freights and the division of earnings is not bad in itself. It is bad, because used to stifle competition. Equally bad is the Joint Traffic agreement before the court, which operates as effectively as any pooling arrangement ever devised. The people have not stopped to inquire whether consolidation would result of necessity in unreasonable rates; neither have they stopped to inquire whether pooling would result necessarily in unreasonable rates. It is the tendency, not the absolute result, which has operated to prohibit consolidation, to prohibit pooling, to prohibit contracts in restraint of trade.

The railroads say that if they are not permitted to prevent competition they will compete and in doing so violate the Interstate Commerce law; that they should be permitted to combine for the purpose of preventing violations of law, even if in doing so competition be prevented.

But to prevent competition is in itself to violate the law. Better the chance to violate one law than the certainty of violating another. Better the motive to violate one law than the mandate to violate another. If the ability the railroads employ to circumvent the law were used to observe it, neither this agreement nor the arguments in support of it would be before the court. The railroads promise to obey one law if the court will permit them to violate another. Would they keep the compact, if made? Respect for law based solely on self-interest is delusive and evanescent.

XI. An attempt is made to distinguish this case from the *Trans-Missouri case* by saying that here the association simply adopted the admitted fair and reasonable rates then in force and filed with the Interstate Commerce Commission by the companies; while in the *Trans-Missouri case* the association was given power to fix rates. But in the Trans-Missouri

agreement the association was only given power to fix reasonable rates, and the fact that the rates fixed by the association during its existence were fair and reasonable was admitted.

In the *Trans-Missouri case*, the association had been dissolved. The only question was the legal effect of the authority conferred by the agreement. If there were no power under the Joint Traffic agreement to change rates, nevertheless the power to maintain rates arbitrarily would involve authority to keep them up after progress and invention should render them excessive and unreasonable. But in point of fact, as pointed out, the Joint Traffic agreement vests in the association, through the managers, with appeal to the board of control, the authority to change rates. This authority is more coercive than that conferred by the Trans-Missouri agreement.

Under the Trans-Missouri agreement five days' written notice prior to each monthly meeting was required to be given the chairman of any proposed reduction in rates. At each monthly meeting the association voted on all changes proposed. All parties were bound by the decision of the association " unless then and there the parties shall give the association definite written notice that in ten days thereafter they shall make such modification, notwithstanding the vote of the association. . . . Should any member insist upon a reduction of rates against the views of the majority, and if in the judgment of said majority the rates so made affect seriously the rates upon through traffic, then the association may, by a majority vote upon such other traffic, put into effect corresponding rates to take effect upon the same day." Moreover, each member of the Trans-Missouri association might, at its peril, make a rate without previous notice to meet the competition of outside lines, giving the chairman notice of its action, so the good faith of the transaction might be passed upon by the association at its next meeting.

Thus, under the Trans-Missouri agreement each member might, at its peril, make a rate to meet outside competition, and each member might, upon giving ten days' notice, make an independent rate, notwithstanding the action of the association. But under the Joint Traffic agreement no company can

deviate from the rates as fixed by the managers, except by a resolution of its board of directors, and thirty days after a copy of such resolution is filed with the managers. This absolutely prevents competition, and the intention to prevent competition is plain from the provision that "the managers, upon receipt of such notice, shall act promptly upon the same for the protection of the parties hereto."

Mr. Carter, in his argument, explained the operation of this clause. Thirty days' notice of the intention of any company, by resolution of its board, to deviate from the rates fixed by the association, through its managers, was required in order that the association might have time to determine its course of action. If it could meet the rate proposed by the deviating member, it would do so. If it could not, it would take steps, in Mr. Carter's language, "to exterminate" the recalcitrant company. In no other way, according to Mr. Carter, could ruinous competition be prevented and the interests of all members of the association protected.

XII. It may be conceded that the public along each line is interested in the line getting its fair share of the through traffic and earnings ; and this it will get under competition. The local public is not entitled, however, to an arbitrary share of the through traffic and earnings. It has a right to no more than the advantages of the line attract. To give it more is to take what belongs to another line and another section. A prosperous section, with an intelligent, progressive population, makes a good railroad, and a good railroad attracts through traffic ; and it is not just or right to take this traffic away and give it to a poor road in order to do for it what the public along its line ought to do.

XIII. The provisions of the Interstate Commerce law preventing discrimination and undue preferences have been discussed ; they can be enforced without suppressing competition. The tenth article of the Joint Traffic agreement provides that "the managers shall decide and enforce the course which shall be pursued with connecting companies not parties to this agreement which fail or decline to observe the rates, fares and rules established under this agreement," and it is

contended that this provision is necessary to prevent discrimination against one company and in favor of another by connecting lines; but a reading of the third section of the Interstate Commerce act shows that the mischief suggested is fully provided for in its concluding paragraph, which provides that every common carrier shall afford equal facilities for the interchange of traffic and for receiving and forwarding freight or passengers from connecting lines, "and shall not discriminate in their rates and charges between such connecting lines."

XIV. It is insisted that if Congress had intended the Anti-Trust law to prohibit every contract in restraint of trade, whether partial or general, reasonable or unreasonable, it would have used the language "every contract in *any* restraint of trade," etc., " is hereby declared to be illegal."

It seems to me, and I submit to the court, that the expression "every contract in restraint of trade " is quite as comprehensive as "every contract in any restraint of trade," and much better language. With due respect to the learned counsel, it might be suggested that if his criticism of the language used be a valid one, why may not the next commentator on this section forcefully insist that Congress should have said "every contract in *any and every* restraint of trade is hereby declared to be illegal "?

XV. The reply to Mr. Phelps' attack upon the constitutionality of the Anti-Trust law as construed by this court in the *Trans-Missouri case*, is to be found in the argument of Mr. Carter that railways are public highways, and in the furnishing of public transportation perform in a sense a governmental function. The right of the Government to regulate contracts between carriers and shippers and to place proper restrictions upon contracts among carriers themselves, in order to protect the interests of the public, as affected by these instrumentalities of commerce, has not heretofore been seriously questioned. The States regulate the construction, maintenance, and operation of railroads, prescribing and enforcing maximum rates, preventing the consolidation of competing lines, and securing to the public the benefit of competition.

The doctrine laid down in the case of *Munn* v. *Illinois*, 94

U. S. 113, applies. When a man devotes his property to a public use, to that extent he grants the public an interest in that use. The same policy which supports the prohibition against consolidation, and the fifth section of the Interstate Commerce law forbidding the pooling of freights or the division of earnings, is the justification for the declaration that all contracts in restraint of trade shall be deemed illegal. The result of the consolidation, the pooling or the combination in restraint of trade, is beside the question. Congress is entitled to pass judgment upon the tendency of a contract in restraint of trade. If it deems such a contract reprehensible, injurious in its tendencies, it may prohibit it, whether the act will result in a particular case in the establishment of reasonable or unreasonable rates.

XVI. *As to the remedy in the case of an unreasonably low rate.* Judge Cooley, in a well-considered opinion, *In re Chicago, St. Paul & Kansas City Railway*, 2 Int. Com. Com. 231, approved by this court in *Interstate Commerce Commission v. Cincinnati, N. O. & Texas Pacific Railway*, 167 U. S. 479, 511, held that under the Interstate Commerce law the commission has no power to determine that a rate is unreasonably low and to order the carrier to refrain from charging such rate on such ground.

XVII. *As to the remedy in the case of an unreasonably high rate.*

The common law requires that rates shall be reasonable and fair. So does the Interstate Commerce law. But this is a mere declaration, and there is no adequate remedy to enforce the right. The commission has no power to prescribe a reasonable rate and enforce it, or to declare that a rate is unreasonable and prohibit it. The shipper is therefore left to recover the excess in rate paid. I know of no case where the excess charged over a reasonable rate on interstate commerce has been recovered back. The amount involved in any particular transaction would be small; it would require years to carry the case through the courts, and no individual shipper would invite the ill will of a powerful railroad by beginning such a contest.

Moreover, the man who actually pays the freight is not the man who suffers from the unreasonable charge. Take the case of grain. The farmer sells to the commission merchant. If the rates are excessive, he gets so much less for his grain or the purchaser from the commission merchant pays so much more for it. The commission merchant who pays the freight has no real interest in the charge. Of course this is not always true, but it does apply with respect to the great shipments handled by middlemen.

Finally, it is questionable under the Interstate Commerce act whether a suit to recover back an excess paid above a reasonable rate can be maintained, if the rate charged was that fixed in the schedule filed with the commission and published under the Interstate Commerce law.

*Mr. James A. Logan* and *Mr. John G. Johnson* filed a brief on behalf of the Pennsylvania Railroad Company and eight other railroad companies, appellees.

*Mr. Robert W. de Forest* and *Mr. David Willcox* filed a brief on behalf of the Central Railroad Company of New Jersey, appellee.

Mr. Justice Peckham, after stating the case, delivered the opinion of the court.

This case has been most ably argued by counsel both for the Government and the railroad companies. The suit is brought to obtain a decree declaring null and void the agreement mentioned in the bill. Upon comparing that agreement with the one set forth in the case of *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, the great similarity between them suggests that a similar result should be reached in the two cases. The respondents, however, object to this, and give several reasons why this case should not be controlled by the other. It is, among other things, said that one of the questions sought to be raised in this case might have been but was not made in the other; that the point therein decided, after holding that the statute applied to rail-

road companies as common carriers, was simply that all contracts, whether in reasonable as well as in unreasonable restraint of trade, were included in the terms of the act, and the question whether the contract then under review was in fact in restraint of trade in any degree whatever was neither made nor decided, while it is plainly raised in this.

Again, it is asserted that there are differences between the provisions contained in the two agreements, of such a material and fundamental nature that the decision in the case referred to ought to form no precedent for the decision of the case now before the court.

It is also objected that the statute, if construed as it has been construed in the *Trans-Missouri case*, is unconstitutional, in that it unduly interferes with the liberty of the individual and takes away from him the right to make contracts regarding his own affairs, which is guaranteed to him by the Fifth Amendment to the Constitution, which provides that "no person shall be . . . deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation." This objection was not advanced in the arguments in the other case.

Finally, a reconsideration of the questions decided in the former case is very strongly pressed upon our attention, because, as is stated, the decision in that case is quite plainly erroneous, and the consequences of such error are far reaching and disastrous, and clearly at war with justice and sound policy, and the construction placed upon the Anti-Trust statute has been received by the public with surprise and alarm.

We will refer to these propositions in the order in which they have been named.

As to the first, we think the report of the *Trans-Missouri case* clearly shows not only that the point now taken was there urged upon the attention of the court, but it was then intentionally and necessarily decided. The whole foundation of the case on the part of the Government was the allegation that the agreement there set forth was a contract or combination in restraint of trade, and unlawful on that account. If

the agreement did not in fact restrain trade, the Government had no case.

If it did not in any degree restrain trade, it was immaterial whether the statute embraced all contracts in restraint of trade, or only such as were in unreasonable restraint thereof. There was no admission or concession in that case that the agreement did in fact restrain trade to a reasonable degree. Hence, it was necessary to determine the fact as to the character of the agreement before the case was made out on the part of the Government.

The great stress of the argument on both sides was undoubtedly upon the question as to the proper construction of the statute, for that seemed to admit of the most doubt, but the other question was before the court, was plainly raised, and was necessarily decided. The opinion shows this to be true. At page 341 of the report the opinion contains the following language :

" The conclusion which we have drawn from the examination above made into the question before us is that the Anti-Trust act applies to railroads, and that it renders illegal all agreements which are in restraint of trade or commerce as we have above defined that expression, and the question then arises whether the agreement before us is of that nature.

*          *          *          *          *

" Does the agreement restrain trade or commerce in any way so as to be a violation of the act ? We have no doubt that it does. The agreement on its face recites that it is entered into for the purpose of mutual protection by establishing and maintaining reasonable rates, rules and regulations on all freight traffic, both through and local.

" To that end the association is formed and a body created which is to adopt rates which, when agreed to, are to be the governing rates for all the companies, and a violation of which subjects the defaulting company to the payment of a penalty, and although the parties have a right to withdraw from the agreement on giving thirty days' notice of a desire so to do, yet while in force and assuming it to be lived up to, there can be no doubt that its direct, immediate and necessary effect is

to put a restraint upon trade or commerce as described in the act. For these reasons the suit of the Government can be maintained without proof of the allegation that the agreement was entered into for the purpose of restraining trade or commerce or for maintaining rates above what was reasonable. The necessary effect of the agreement is to restrain trade or commerce, no matter what the intent was on the part of those who signed it."

The bill of the complainants in that case, while alleging an illegal and unlawful intent on the part of the railroad companies in entering into the agreement, also alleged that by means of the agreement the trade, traffic and commerce in the region of country affected by the agreement had been and were monopolized and restrained, hindered, injured and retarded. These allegations were denied by defendants.

There was thus a clear issue made by the pleadings as to the character of the agreement, whether it was or was not one in restraint of trade.

The extract from the opinion of the court above given shows that the issue so made was not ignored, nor was it assumed as a concession that the agreement did restrain trade to a reasonable extent. The statement in the opinion is quite plain, and it inevitably leads to the conclusion that the question of fact as to the necessary tendency of the agreement was distinctly presented to the mind of the court, and was consciously, purposely and necessarily decided. It cannot, therefore, be correctly stated that the opinion only dealt with the question of the construction of the act, and that it was assumed that the agreement did to some reasonable extent restrain trade. In discussing the question as to the proper construction of the act, the court did not touch upon the other aspect of the case, in regard to the nature of the agreement itself, but when the question of construction was finished, the opinion shows that the question as to the nature of the agreement was then entered upon and discussed as a fact necessary to be decided in the case, and that it in fact was decided. An unlawful intent in entering into the agreement was held im-

material, but only for the reason that the agreement did in-fact and by its terms restrain trade.

Second.  We have assumed that the agreements in the two cases were substantially alike.  This the respondents by no means admit, and they assert that there are such material and substantial differences in the provisions of the two instruments as to necessitate a different result in this case from that arrived at in the other.

The expressed purpose of the agreement in this case is, among other things, " to establish and maintain reasonable and just rates, fares, rules and regulations on state and interstate traffic."  The companies agree that the schedule of rates and fares already duly published and in force and authorized by the companies, parties to the agreement, and filed, as to interstate traffic, with the Interstate Commerce Commission, shall be reaffirmed, and copies of all such schedules are to be filed, with the managers constituted under the agreement, within ten days after it becomes effective.  The managers may from time to time recommend changes in the rates, etc., and a failure to observe the recommendations is deemed a violation of the agreement.  No company can deviate from these rates except under a resolution of its board of directors, and such resolution can only take effect thirty days after service of a copy thereof on the managers, who, upon receipt thereof, " shall act promptly for the protection of the parties hereto."  For a violation of the agreement the offending company forfeits to the association a sum to be determined by the managers thereof, not exceeding five thousand dollars, or more upon the contingency named in the rule.

So far as the establishment of rates and fares is concerned, we do not see any substantial difference between this agreement and the one set forth in the *Trans-Missouri case.*  In that case the rates were established by the agreement, and any company violating the schedule of rates as established under the agreement was liable to a penalty.  A company could withdraw from the association on giving thirty days' notice, but while it continued a member it was bound to charge the rates fixed, under a penalty for not doing so.  In

this case the companies are bound to charge the rates fixed upon originally in the agreement or subsequently recommended by the board of managers, and the failure to observe their recommendations is deemed a violation of the agreement. The only alternative is the adoption of a resolution by the board of directors of any company providing for a change of rates so far as that company is concerned, and the service of a copy thereof upon the board of managers as already stated. This provision for changing rates by any one company is absent from the other agreement. It is this provision which is referred to by counsel as most material and important, and one which constitutes a material and important distinction between the two agreements. It is said to be designed solely to prevent secret and illegal competition in rates, while at the same time providing for and permitting open competition therein, and that unless it can be regarded as restraining competition so as to restrain trade, there is not even an appearance of restraint of trade in the agreement. It is obvious, however, that if such deviation from rates by any company from those agreed upon, be tolerated, the principal object of the association fails of accomplishment, because the purpose of its formation is the establishment and maintenance of reasonable and just rates and a general uniformity therein. If one company is allowed, while remaining a member of the association, to fix its own rates and be guided by them, it is plain that as to that company the agreement might as well be rescinded. This result was never contemplated. In order, therefore, not only to prevent secret competition, but also to prevent any competition whatever among the companies parties to the agreement, the provision is therein made for the prompt action of the board of managers whenever it receives a copy of the resolution adopted by the board of directors of any one company for a change of the rates as established under the agreement. By reason of this provision the board undoubtedly has authority and power to enforce the uniformity of rates as against the offending company upon pain of an open, rigorous and relentless war of competition against it on the part of the whole association.

A company desirous of deviating from the rates agreed upon and which its associates desire to maintain is at once confronted with this probability of a war between itself on the one side and the whole association on the other, in the course of which rates would probably drop lower than the company was proposing, and lower than it would desire or could afford, and such a prospect would be generally sufficient to prevent the inauguration of the change of rates and the consequent competition. Thus the power to commence such a war on the part of the managers would operate to most effectually prevent a deviation from rates by any one company against the desire of the other parties to the agreement. Competition would be prevented by the fear of the united competition of the association against the particular member. Counsel for the association themselves state that the agreement makes it the duty of the managers, in case the defection should injuriously affect some particular members more than others, to endeavor to furnish reasonable protection to such members, presumably by allowing them to change rates so as to meet such competition, or by recommending such fierce competition as to persuade the recalcitrant to fall back into line. By this course the competition is open, but none the less sufficient on that account, and the desired and expected result is to be the yielding of the offending company, induced by the war which might otherwise be waged against it by the combined force of all the other parties to the agreement. Under these circumstances the agreement, taken as a whole, prevents, and was evidently intended to prevent, not only secret but any competition. The abstract right of a single company to deviate from the rates becomes immaterial, and its exercise, to say the least, very inexpedient, in the face of this power of the managers to enlist the whole association in a war upon it. This is not all, however, for the agreement further provides that the managers are to have power to organize such joint freight and passenger agencies as they may deem desirable, and if established they are to be so arranged as to give proper representation to each company, and no soliciting or contracting passenger or freight agency can be maintained by any of the

companies, except with the approval of the managers. They are also charged with the duty of securing to each company, party to the agreement, equitable proportions of the competitive traffic covered by the agreement, so far as can be legally done. The natural, direct and necessary effect of all these various provisions of the agreement is to prevent any competition whatever between the parties to it for the whole time of its existence. It is probably as effective in that way as would be a provision in the agreement prohibiting in terms any competition whatever.

It is also said that the agreement in the first case conferred upon the association an unlimited power to fix rates in the first instance, and that the authority was not confined to reasonable rates, while in the case now before us the agreement starts out with rates fixed by each company for itself and filed with the Interstate Commerce Commission, and which rates are alleged to be reasonable. The distinction is unimportant. It was considered in the other case that the rates actually fixed upon were reasonable, while the rates fixed upon in this case are also admitted to be reasonable. By this agreement the board of managers is in substance and as a result thereof placed in control of the business and rates of transportation, and its duty is to see to it that each company charges the rates agreed upon and receives its equitable proportion of the traffic.

The natural and direct effect of the two agreements is the same, viz., to maintain rates at a higher level than would otherwise prevail, and the differences between them are not sufficiently important or material to call for different judgments in the two cases on any such ground. Indeed, counsel for one of the railroad companies on this argument, in speaking of the agreement in the *Trans-Missouri case*, says of it that its terms, while substantially similar to those of the agreement here, were less explicit in making it just and reasonable.

Regarding the two agreements as alike in their main and material features, we are brought to an examination of the question of the constitutionality of the act, construed as it has

been in the *Trans-Missouri case.* It is worthy of remark that this question was never raised or hinted at upon the argument of that case, although, if the respondents' present contention be sound, it would have furnished a conclusive objection to the enforcement of the act as construed. The fact that not one of the many astute and able counsel for the transportation companies in that case raised an objection of so conclusive a character, if well founded, is strong evidence that the reasons showing the invalidity of the act as construed do not lie on the surface and were not then apparent to those counsel.

The point not being raised and the decision of that case having proceeded upon an assumption of the validity of the act under either construction, it can, of course, constitute no authority upon this question. Upon the constitutionality of the act it is now earnestly contended that contracts in restraint of trade are not necessarily prejudicial to the security or welfare of society, and that Congress is without power to prohibit generally all contracts in restraint of trade, and the effort to do this invalidates the act in question. It is urged that it is for the court to decide whether the mere fact that a contract or arrangement, whatever its purpose or character, may restrain trade in some degree, renders it injurious or prejudicial to the welfare or security of society, and if the court be of opinion that such welfare or security is not prejudiced by a contract of that kind, then Congress has no power to prohibit it, and the act must be declared unconstitutional. It is claimed that the act can be supported only as an exercise of the police power, and that the constitutional guarantees furnished by the Fifth Amendment secure to all persons freedom in the pursuit of their vocations and the use of their property, and in making such contracts or arrangements as may be necessary therefor. In dwelling upon the far-reaching nature of the language used in the act as construed in the case mentioned, counsel contend that the extent to which it limits the freedom and destroys the property of the individual can scarcely be exaggerated, and that ordinary contracts and combinations, which are at the same time most indispensable, have the effect of somewhat

restraining trade and commerce, although to a very slight extent, but yet, under the construction adopted, they are illegal.

As examples of the kinds of contracts which are rendered illegal by this construction of the act, the learned counsel suggest all organizations of mechanics engaged in the same business for the purpose of limiting the number of persons employed in the business, or of maintaining wages; the formation of a corporation to carry on any particular line of business by those already engaged therein; a contract of partnership or of employment between two persons previously engaged in the same line of business; the appointment by two producers of the same person to sell their goods on commission; the purchase by one wholesale merchant of the product of two producers; the lease or purchase by a farmer, manufacturer or merchant of an additional farm, manufactory or shop; the withdrawal from business of any farmer, merchant or manufacturer; a sale of the good will of a business with an agreement not to destroy its value by engaging in similar business; and a covenant in a deed restricting the use of real estate. It is added that the effect of most business contracts or combinations is to restrain trade in some degree.

This makes quite a formidable list. It will be observed, however, that no contract of the nature above described is now before the court, and there is some embarrassment in assuming to decide herein just how far the act goes in the direction claimed. Nevertheless, we might say that the formation of corporations for business or manufacturing purposes has never, to our knowledge, been regarded in the nature of a contract in restraint of trade or commerce. The same may be said of the contract of partnership. It might also be difficult to show that the appointment by two or more producers of the same person to sell their goods on commission was a matter in any degree in restraint of trade.

We are not aware that it has ever been claimed that a lease or purchase by a farmer, manufacturer or merchant of an additional farm, manufactory or shop, or the withdrawal from business of any farmer, merchant or manufacturer, restrained commerce or trade within any legal definition of that term;

and the sale of a good will of a business with an accompanying agreement not to engage in a similar business was instanced in the *Trans-Missouri case* as a contract not within the meaning of the act ; and it was said that such a contract was collateral to the main contract of sale and was entered into for the purpose of enhancing the price at which the vendor sells his business. The instances cited by counsel have in our judgment little or no bearing upon the question under consideration. In *Hopkins* v. *United States*, decided at this term, *post*, 578, we say that the statute applies only to those contracts whose direct and immediate effect is a restraint upon interstate commerce, and that to treat the act as condemning all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased, would enlarge the application of the act far beyond the fair meaning of the language used. The effect upon interstate commerce must not be indirect or incidental only. An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation, with no purpose to thereby affect or restrain interstate commerce, and which does not directly restrain such commerce, is not, as we think, covered by the act, although the agreement may indirectly and remotely affect that commerce. We also repeat what is said in the case above cited, that " the act of Congress must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it." To suppose, as is assumed by counsel, that the effect of the decision in the *Trans-Missouri case* is to render illegal most business contracts or combinations, however indispensable and necessary they may be, because, as they assert, they all restrain trade in some remote and indirect degree, is to make a most violent assumption and one not called for or justified by the decision mentioned, or by any other decision of this court.

The question really before us is whether Congress, in the exercise of its right to regulate commerce among the several States, or otherwise, has the power to prohibit, as in restraint

of interstate commerce, a contract or combination between competing railroad corporations entered into and formed for the purpose of establishing and maintaining interstate rates and fares for the transportation of freight and passengers on any of the railroads parties to the contract or combination, even though the rates and fares thus established are reasonable. Such an agreement directly affects and of course is intended to affect the cost of transportation of commodities, and commerce consists, among other things, of the transportation of commodities, and if such transportation be between States it is interstate commerce. The agreement affects interstate commerce by destroying competition and by maintaining rates above what competition might produce.

If it did not do that, its existence would be useless, and it would soon 'be rescinded or abandoned. Its acknowledged purpose is to maintain rates, and if executed, it does so. It must be remembered, however, that the act does not prohibit any railroad company from charging reasonable rates. If in the absence of any contract or combination among the railroad companies the rates and fares would be, less than they are under such contract or combination, that is not by reason of any provision of the act which itself lowers rates, but only because the railroad companies would, as it is urged, voluntarily and at once inaugurate a war of competition among themselves, and thereby themselves reduce their rates and fares.

Has not Congress with regard to interstate commerce and in the course of regulating it, in the case of railroad corporations, the power to say that no contract or combination shall be legal which shall restrain trade and commerce by shutting out the operation of the general law of competition? We think it has.

As counsel for the Traffic Association has truly said, the ordinary highways on land have generally been established and maintained by the public. When the matter of the building of railroads as highways arose, a question was presented whether the State should itself build them or permit others to do it. The State did not build them, and as their building required, among other things, the appropriation of

land, private individuals could not enforce such appropriation without a grant from the State.

The building and operation of a railroad thus required a public franchise. The State would have had no power to grant the right of appropriation unless the use to which the land was to be put was a public one. Taking land for rail-road purposes is a taking for a public purpose, and the fact that it is taken for a public purpose is the sole justification for taking it at all. The business of a railroad carrier is of a public nature, and in performing it the carrier is also performing to a certain extent a function of government which, as counsel observed, requires them to perform the service upon equal terms to all. This public service, that of transportation of passengers and freight, is a part of trade and commerce, and when transported between States such commerce becomes what is described as interstate, and comes, to a certain extent, under the jurisdiction of Congress by virtue of its power to regulate commerce among the several States.

Where the grantees of this public franchise are competing railroad companies for interstate commerce, we think Congress is competent to forbid any agreement or combination among them by means of which competition is to be smothered.

Although the franchise when granted by the State becomes by the grant the property of the grantee, yet there are some regulations respecting the exercise of such grants which Congress may make under its power to regulate commerce among the several States. This will be conceded by all, the only question being as to the extent of the power.

We think it extends at least to the prohibition of contracts relating to interstate commerce, which would extinguish all competition between otherwise competing railroad corporations, and which would in that way restrain interstate trade or commerce. We do not think, when the grantees of this public franchise are competing railroads seeking the business of transportation of men and goods from one State to another, that ordinary freedom of contract in the use and management of their property requires the right to combine

as one consolidated and powerful association for the purpose of stifling competition among themselves, and of thus keeping their rates and charges higher than they might otherwise be under the laws of competition. And this is so, even though the rates provided for in the agreement may for the time be not more than are reasonable. They may easily and at any time be increased. It is the combination of these large and powerful corporations, covering vast sections of territory and influencing trade throughout the whole extent thereof, and acting as one body in all the matters over which the combination extends, that constitutes the alleged evil, and in regard to which, so far as the combination operates upon and restrains interstate commerce, Congress has power to legislate and to prohibit.

The prohibition of such contracts may in the judgment of Congress be one of the reasonable necessities for the proper regulation of commerce, and Congress is the judge of such necessity and propriety, unless, in case of a possible gross perversion of the principle, the courts might be applied to for relief.

The cases cited by the respondents' counsel in regard to the general constitutional right of the citizen to make contracts relating to his lawful business are not inconsistent with the existence of the power of Congress to prohibit contracts of the nature involved in this case. The power to regulate commerce has no limitation other than those prescribed in the Constitution. The power, however, does not carry with it the right to destroy or impair those limitations and guarantees which are also placed in the Constitution or in any of the amendments to that instrument. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312–336; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447–479.

Among these limitations and guarantees counsel refer to those which provide that no person shall be deprived of life, liberty or property without due process of law, and that private property shall not be taken for public use without just compensation. The latter limitation is, we think, plainly irrelevant.

As to the former, it is claimed that the citizen is deprived of his liberty without due process of law when, by a general statute, he is arbitrarily deprived of the right to make a contract of the nature herein involved.

The case of *Allgeyer* v. *Louisiana*, 165 U. S. 578, is cited as authority for the statement concerning the right to contract. In speaking of the meaning of the word "liberty," as used in the Fourteenth Amendment to the Constitution, it was said in that case to include, among other things, the liberty of the citizen to pursue any livelihood or vocation, and for that purpose to enter into all contracts which might be proper, necessary and essential to his carrying out those objects to a successful conclusion.

We do not impugn the correctness of that statement. The citizen may have the right to make a proper (that is, a lawful) contract, one which is also essential and necessary for carrying out his lawful purposes. The question which arises here is, whether the contract is a proper or lawful one, and we have not advanced a step towards its solution by saying that the citizen is protected by the Fifth, or any other amendment, in his right to make proper contracts to enable him to carry out his lawful purposes. We presume it will not be contended that the court meant, in stating the right of the citizen "to pursue any livelihood or vocation," to include every means of obtaining a livelihood, whether it was lawful or otherwise. Precisely how far a legislature can go in declaring a certain means of obtaining a livelihood unlawful, it is unnecessary here to speak of. It will be conceded it has power to make some kinds of vocations and some methods of obtaining a livelihood unlawful, and in regard to those the citizen would have no right to contract to carry them on.

Congress may restrain individuals from making contracts under certain circumstances and upon certain subjects. *Frisbie* v. *United States*, 157 U. S. 160.

Notwithstanding the general liberty of contract which is possessed by the citizen under the Constitution, we find that there are many kinds of contracts which, while not in themselves immoral or *mala in se*, may yet be prohibited by the

legislation of the States or, in certain cases, by Congress. The question comes back whether the statute under review is a legitimate exercise of the power of Congress over interstate commerce and a valid regulation thereof. The question is, for us, one of power only, and not of policy. We think the power exists in Congress, and that the statute is therefore valid.

Finally, we are asked to reconsider the question decided in the *Trans-Missouri case*, and to retrace the steps taken therein, because of the plain error contained in that decision and the widespread alarm with which it was received and the serious. consequences which have resulted, or may soon result, from the law as interpreted in that case.

It is proper to remark that an application for a reconsideration of a question but lately decided by this court is usually based upon a statement that some of the arguments employed on the original hearing of the question have been overlooked or misunderstood, or that some controlling authority has been either misapplied by the court or passed over without discussion or notice. While this is not strictly an application for a rehearing in the same case, yet in substance it is the same thing. The court is asked to reconsider a question but just decided after a careful investigation of the matter involved. There have heretofore been in effect two arguments of precisely the same questions now before the court, and the same arguments were addressed to us on both those occasions. The report of the *Trans-Missouri case* shows a dissenting opinion delivered in that case, and that the opinion was concurred in. by three other members of the court.

That opinion, it will be seen, gives with great force and. ability the arguments against the decision which was finally arrived at by the court. It was after a full discussion of the questions involved and with the knowledge of the views entertained by the minority as expressed in the dissenting opinion that the majority of the court came to the conclusion it did. Soon after the decision a petition for a rehearing of the case was made, supported by a printed argument in its favor, and pressed with an earnestness and vigor and at a length which were certainly commensurate with the importance of the case.

This court, with care and deliberation and also with a full appreciation of their importance, again considered the questions involved in its former decision.

A majority of the court once more arrived at the conclusion it had first announced, and accordingly it denied the application. And now for the third time the same arguments are employed, and the court is again asked to recant its former opinion, and to decide the same question in direct opposition to the conclusion arrived at in the *Trans-Missouri case.*

The learned counsel while making the application frankly confess that the argument in opposition to the decision in the case above named has been so fully, so clearly and so forcibly presented in the dissenting opinion of Mr. Justice White, that it is hardly possible to add to it nor is it necessary to repeat it.

The fact that there was so close a division of opinion in this court when the matter was first under advisement, together with the different views taken by some of the judges of the lower courts, led us to the most careful and scrutinizing examination of the arguments advanced by both sides, and it was after such an examination that the majority of the court came to the conclusion it did.

It is not now alleged that the court on the former occasion overlooked any argument for the respondents or misapplied any controlling authority. It is simply insisted that the court, notwithstanding the arguments for an opposite view, arrived at an erroneous result, which, for reasons already stated, ought to be reconsidered and reversed.

As we have twice already deliberately and earnestly considered the same arguments which are now for a third time pressed upon our attention, it could hardly be expected that our opinion should now change from that already expressed.

While an erroneous decision might be in some cases properly reconsidered and overruled, yet it is clea  that the first necessity is to convince the court that the decision was erroneous. It is scarcely to be assumed that such a result could be

secured by the presentation for a third time of the same arguments which had twice before been unsuccessfully urged upon the attention of the court.

We have listened to them now because the eminence of the counsel engaged, their earnestness and zeal, their evident belief in the correctness of their position, and, most important of all, the very grave nature of the questions argued, called upon the court to again give to those arguments strict and respectful attention. It is not matter for surprise that we still are unable to see the error alleged to exist in our former decision, or to change our opinion regarding the questions therein involved.

Upon the point that the agreement is not in fact one in restraint of trade, even though it did prevent competition, it must be admitted that the former argument has now been much enlarged and amplified, and a general and most masterly review of that question has been presented by counsel for the respondents. That this agreement does in fact prevent competition, and that it must have been so intended, we have already attempted to show. Whether stifling competition tends directly to restrain commerce in the case of naturally competing railroads, is a question upon which counsel have argued with very great ability. They acknowledge that this agreement purports to restrain competition, although, they say, in a very slight degree and on a single point. They admit that if competition and commerce were identical, being but different names for the same thing, then, in assuming to restrain competition even so far, it would be assuming in a corresponding degree to restrain commerce. Counsel then add (and therein we entirely agree with them) that no such identity can be pretended, because it is plain that commerce can and does take place on a large scale and in numerous forms without competition. The material considerations therefore turn upon the effects of competition upon the business of railroads, whether they are favorable to the commerce in which the roads are engaged, or unfavorable and in restraint of that commerce. Upon that question it is contended that agreements between railroad companies of the

nature of that now before us are promotive instead of in restraint of trade.

This conclusion is reached by counsel after an examination of the peculiar nature of railroad property and the alleged baneful effects of competition upon it and also upon the public. It is stated that the only resort open to railroads to save themselves from the effects of a ruinous competition is that of agreements among themselves to check and control it. A ruinous competition is, as they say, apt to be carried on until the weakest of the combatants goes to destruction. After that the survivor, being relieved from competition, proceeds to raise its prices as high as the business will bear. Commerce, it is said, thus finally becomes restrained by the effects of competition, while, at the same time, otherwise valuable railroad property is thereby destroyed or greatly reduced in value. There can be no doubt that the general tendency of competition among competing railroads is towards lower rates for transportation, and the result of lower rates is generally a greater demand for the articles so transported, and this greater demand can only be gratified by a larger supply, the furnishing of which increases commerce. This is the first and direct result of competition among railroad carriers.

In the absence of any agreement restraining competition, this result, it is argued, is neutralized, and the opposite one finally reached by reason of the peculiar nature of railroad property which must be operated and the capital invested in which cannot be withdrawn, and the railroad managers are therefore, as is claimed, compelled to not only compete among themselves for business, but also to carry on the war of competition until it shall terminate in the utter destruction or the buying up of the weaker roads, after which the survivor will raise the rates as high as is possible. Thus the indirect but final effect of competition is claimed to be the raising of rates and the consequent restraint of trade, and it is urged that this result is only to be prevented by such an agreement as we have here. In that way alone it is said that competition is overcome, and general uniformity and reasonableness of rates securely established.

The natural, direct and immediate effect of competition is, however, to lower rates, and to thereby increase the demand for commodities, the supplying of which increases commerce, and an agreement, whose first and direct effect is to prevent this play of competition, restrains instead of promoting trade and commerce. Whether, in the absence of an agreement as to rates, the consequences described by counsel will in fact follow as a result of competition, is matter of very great uncertainty, depending upon many contingencies and in large degree upon the voluntary action of the managers of the several roads. Railroad companies may and often do continue in existence and engage in their lawful traffic at some profit, although they are competing railroads and are not acting under any agreement or combination with their competitors upon the subject of rates. It appears from the brief of counsel in this case that the agreement in question does not embrace all of the lines or systems engaged in the business of railroad transportation between Chicago and the Atlantic coast. It cannot be said that destructive competition, or, in other words, war to the death, is bound to result unless an agreement or combination to avoid it is entered into between otherwise competing roads.

It is not only possible but probable that good sense and integrity of purpose would prevail among the managers, and while making no agreement and entering into no combination by which the whole railroad interest as herein represented should act as one combined and consolidated body, the managers of each road might yet make such reasonable charges for the business done by it as the facts might justify. An agreement of the nature of this one which directly and effectually stifles competition, must be regarded under the statute as one in restraint of trade, notwithstanding there are possibilities that a restraint of trade may also follow competition that may be indulged in until the weaker roads are completely destroyed and the survivor thereafter raises rates and maintains them.

Coming to the conclusion we do, in regard to the various questions herein discussed, we think it unnecessary to

further allude to the other reasons which have been advanced for a reconsideration of the decision in the *Trans-Missouri case.*

> *The judgments of the Circuit Court of the United States for the Southern District of New York and of the Circuit Court of Appeals for the Second Circuit are reversed, and the case remanded to the Circuit Court with directions to take such further proceedings therein as may be in conformity with this opinion.*

MR. JUSTICE GRAY, MR. JUSTICE SHIRAS and MR. JUSTICE WHITE dissented.

MR. JUSTICE McKENNA took no part in the decision of the case.