INTERSTATE COMMERCE COMMISSION v. SOUTHERN PAC. CO. et al.

(Circuit Court, S. D. California, S. D. December 12, 1904.)

No. 1,039.

1. INTERSTATE COMMERCE—SUIT TO ENFORCE ORDERS OF COMMISSION—SUPERSEDEAS PENDING APPEAL.

The provision of section 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), that, in proceedings thereunder to enforce an order of the Commission, an appeal shall not operate to stay or supersede the order of the court appealed from, is merely declaratory of the general rule in equity, and does not affect the power of the court, under equity rule 93, to grant a stay pending appeal, in its discretion.

2. SAME.

A Circuit Court will not supersede a decree enjoining railroad companies from violating an order of the Interstate Commerce Commission affecting rates, entered in a suit brought by the Commission pursuant to section 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), pending an appeal from such

decree, where it does not appear that the damage to defendants from the enforcement of the decree will be greater than that which would result to shippers from its suspension.

In Equity.   On motion to supersede decree.
See 132 Fed. 829.

L. H. Valentine, U. S. Atty., L. A. Shaver, and J. H. Call, Special Asst. U. S. Atty., for complainant.

Wm. F. Herrin, Flint & Barker, T. J. Norton, and E. E. Millikin, for defendants.

WELLBORN, District Judge.  There are so many matters of importance in the Circuit Court urgently pressing for immediate attention that it is impracticable, even if the exigencies of the pending motion admitted of the delay, for me to take time now to prepare a written opinion herein; and I shall simply announce my conclusions, and then either make the necessary orders this morning, or if, as indicated by Mr. Millikin, further postponement be desired until to-morrow, continue the matter over until that time for final action.

The provision of section 16 of the commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), that an appeal shall not stay or supersede the operation of the final decree, is still in force.  That provision was not expressly repealed by, nor is it repugnant to, either Act March 3, 1891, c. 517, § 2, 26 Stat. 826 [U. S. Comp. St. 1901, p. 547], establishing the Circuit Court of Appeals, nor Act Feb. 11, 1903, c. 544, 32 Stat. 823 [U. S. Comp. St. Supp. 1903, p. 376], and Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1903, p. 363], to expedite interstate commerce and other cases, but all are consistent and may well stand together.  The rule that repeals by implication are not favored is too elementary to need any citation of authorities in its support.

I have, in the short time allowed for investigation since this matter was last before me, read the Behlmer Case—Louisville, etc., Railroad v. Behlmer, 169 U. S. 644, 18 Sup. Ct. 502, 42 L. Ed. 889— and am of opinion that it is not antagonistic to, but supports, the conclusion which I have announced.

The next question is as to the effect of said section 16.  Is it merely declaratory of the general equity practice which existed at the time the commerce act was passed, or was it intended by Congress thereby to exclude interstate commerce cases from the operation of equity rule 93?  This, to my mind, is a doubtful question. There are arguments well worthy of consideration on both sides.

In favor of the former construction, for which defendants contend, it may be said that the phraseology of the section does not necessarily import an intention to limit or otherwise affect the operation of equity rule 93.  But it must be conceded, in favor of the other side, that, unless the intention of Congress was to limit the scope of rule 93, there was no necessity for the insertion of the provision in the act.

Judge Toulmin, in Interstate Commerce Commission v. Louisville & N. R. Co. et al. (C. C.) 101 Fed. 146, has held that said provision is only declaratory of existing law, and not intended in any way to affect rule 93; and, for the purposes of this motion, I shall resolve my own doubts in favor of that interpretation, and assume that equity rule 93 is unaffected by section 16 of the commerce act, and that there still resides in the trial judge discretion, under suitable circumstances, to stay or supersede the decree finally rendered by him.

This brings me to the question whether or not the pending motion presents a case calling for the exercise of said discretion. In order to justify the exercise of the discretion, or, stating the matter concretely, in order to justify the suspension of the decree in this case, it should be made to appear, first, that irremediable loss will result to the defendants, during the pendency of the proposed appeal, from th- enforcement of the decree; and, second, that no such loss will result to the complainant from its suspension.

The two conditions set forth in the preceding paragraph constitute substantially the familiar equity doctrine of comparative hardships, which under some circumstances is determinative on applications for provisional or temporary injunctions; that is to say, under certain circumstances, without stopping to enumerate what such circumstances are, the court will grant an injunction if the damages resulting to the defendant would be less than those resulting to the complainant from its refusal. This rule, it should be observed, however, is applied by courts of equity in advance of any hearing upon the merits, and is therefore the most favorable rule the defendants in the case at bar could invoke, because here there have been practically two decrees on the merits against them —one the order of the Interstate Commerce Commission, and the other affirmation of said order by this court.

It may be conceded that the defendants will sustain by the enforcement of the decree during the pendency of the contemplated appeal damages, for which no adequate compensation can be found. This concession I make without going into the details or elements of damage, but with the qualification that the amount of damage, in the nature of things, is unascertainable. When I have said that defendants will sustain damages—large or considerable damages, it may be—by the enforcement of the decree during the pendency of the appeal, the amount of which, however, is unascertainable, the case has been stated as strongly in favor of defendants as its circumstances will permit.

The next question in logical sequence is as to the effect a suspension will have upon the complainant; and by "complainant" I do not, of course, mean the Interstate Commerce Commission, but the public at large, or, more directly, the shippers of citrus fruits, of whom said complainant, as I held by my written opinion upon the merits, is but the representative in this litigation. In what condition, then, would a stay of this decree leave the shippers of citrus fruits? How would it affect them? The decree restores to these shippers the routing privilege. The stay of the decree would

longer withhold it from them. Denial of said privilege to the shippers, as found in my opinion above mentioned, has utterly destroyed competition for this traffic between the Eastern connections of the initial lines; and, to appreciate the advantages of competition, as estimated by the highest judicial tribunal of the land, we have only to read the opinions of the Supreme Court in the Freight Association and Joint Traffic Association Cases, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259.

Mr. Bissell, in his affidavit filed on this motion, says that the shipments of citrus fruits this season will probably be between 25,000 and 30,000 cars. What the benefits of competition may be to the shippers of that vast product cannot be told accurately in dollars and cents, but it would be difficult to overstate them. The strenuous efforts put forth by both parties in this litigation to secure the routing privilege abundantly testify to its great value.

Of course, when I speak of the value of competition to the shipper, I do not include rebates as an element of such value. Rebates flagrantly violate the commerce act, and it is hard to find language strong enough to suitably condemn and stigmatize them. But the remedy for rebates is to be found in the severe penal sanctions denounced against them, and not in pooling arrangements between competing railroads, which are themselves violative of said act. As I said in my previous opinion, already mentioned, one violation of the commerce act cannot be justified on the plea that it tends to or will suppress or has suppressed another infraction of the act.

I repeat, it does not appear from this motion, and counsel for defendants have industriously and with ability presented all that can be said on their side of the question— It has not been made to appear that the damage to defendants will be any greater from the enforcement of the decree than would be the damage to the shippers from its suspension, and this view of the case is conclusive against a suspension of the decree.

There is one other matter which ought to be adverted to, in view of the discussion I invited from defendants' counsel day before yesterday, and that is whether or not the joint tariff is violative of the anti-trust act.

I said then, and subsequent reflection has confirmed me in the belief, that the question last stated might be material on this hearing, for the reason that, if the joint tariff is confessedly or beyond reasonable controversy a violation of the anti-trust act, then, whatever may be its relation to the commerce act, the court would not entertain favorably an application to suspend the decree, because the inevitable and obvious result would be to sanction and promote unlawful transactions.

The record in the case shows, beyond dispute, that the initial carriers have entered into an agreement for a fixed rate upon citrus fruits. In the very beginning of my opinion I find as follows:

"The defendants are initial carriers for the transportation of citrus fruits of Southern California to points on and east of the Missouri river. The termini of the Southern Pacific Company are at Ogden and El Paso. The Santa

Fé terminal is at Chicago. The points of destination located beyond these termini are reached through connecting carriers.

"Pursuant to a previous agreement between the defendants and their Eastern connections, effected through correspondence opened by the circular letter of R. H. Countiss, agent, dated October 9, 1899, hereinafter set forth, and sent out at the instance of defendants to their said connections, a joint tariff relating to citrus fruits, and fixing a through rate thereon of $1.25 per hundred pounds from Southern California to all points east of the Missouri river, was filed with the Interstate Commerce Commission on January 1, 1900."

This finding was embodied in the decree as follows:

"Issue having been joined, the testimony having been taken, and the cause having been duly argued and submitted, and the court being fully advised in the premises, now finds and determines that the allegations of fact made in the bill of complaint herein are true, and that the defendants and their Eastern connections—said connections being different and competing railroads— filed with the Interstate Commerce Commission, pursuant to a previous agreement between them, a joint tariff relating to citrus fruits, and fixing thereon a through rate of $1.25 per hundred pounds," etc.

Said findings are abundantly supported by the testimony, and I believe there is nothing in the record of a contradictory character.

The joint tariff signed by the representatives of the railroads declares on its face the existence of an agreement as follows: "The joint tariffs and rates herein named are made and entered into upon the express condition." Then follows the routing rule. Certainly it cannot be successfully contended, in the face of this language, that there is no contract as to rates.

But Mr. Norton suggests that this is not a contract, within the meaning of the anti-trust law, because it is not binding upon the parties. I find on the face of the joint tariff a clause favorable to Mr. Norton's suggestion: "This tariff contains," etc., "and is subject to change by each company without the consent of any of the other companies whose names appear thereon." The commerce act itself, however, provides, I think, that, where tariffs have been filed with the Commission, there can be no advance of rates except upon ten days' notice, nor even a reduction except upon three days' notice, so that the joint tariff, it would seem, is obligatory certainly for three, and probably ten days. Does the duration of a contract, whether short or long, determine or in any way affect its validity or binding character?

However, it is unnecessary now to determine whether or not the joint tariff in question violates the anti-trust law, since the other views hereinbefore expressed are fatal to the pending motion, and on them my decision is rested.

Said motion will be denied, and the existing stays at once terminated.